IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF NORTH CAROLINA
Case No. 1:24-cv-881

| | |
|---|---|
| **JURYX, LLC,**<br><br>    **Plaintiff,**<br><br>**v.**<br><br>**LAUREN E. KULP; TANDEM LEGAL SOLUTIONS LLC,**<br><br>    **Defendants.** | **VERIFIED COMPLAINT [PRELIMINARY INJUNCTION REQUESTED]** |

Plaintiff JuryX, LLC, d/b/a Jury-X® ("Jury-X"), by and through its undersigned counsel, for its Verified Complaint against Defendants, Lauren E. Kulp ("Defendant Kulp" or "Kulp") and Tandem Legal Solutions LLC ("Defendant Tandem" or "Tandem") (together, "Defendants"), states as follows:

## I. INTRODUCTION

1. Jury-X is a successful jury research and consulting company that mitigates biased decision-making in juries by assisting experienced attorneys in juror analysis and selection for tort cases.

2. Jury-X was, upon information and belief, the first of its kind in the jury consulting market. And until recently, it remained the only of its kind.[1] But now, Defendant Kulp's actual and threatened misappropriation of Jury-X's trade secrets threatens to undue all Jury-X's goodwill and position in the marketplace.

---

[1] Jury-X's unique approach to jury analysis and consulting is detailed in Paragraphs 33 through 62 of this Verified Complaint.

3.     Defendant Kulp was hired by Jury-X as a researcher in 2019. She came to Jury-X with no background in jury analysis, selection, or consulting.

4.     Jury-X promoted Defendant Kulp several times. Through these promotions, Defendant Kulp became a valued and trusted member of Jury-X's core team staff. Jury-X gave Kulp access to the heart of Jury-X's trade secrets and other confidential and proprietary information, and Jury-X taught Kulp its proprietary methods and processes.

5.     At the time of her initial employment and subsequent promotions, Defendant Kulp signed multiple employment agreements protecting Jury-X's confidential and trade secret information.

6.     Defendant Kulp resigned from Jury-X on December 5, 2023.

7.     At the time of her resignation, Defendant Kulp was, upon information and belief, intending to form her own company, offering services *identical* to those offered by Jury-X. These are services that could *only* be performed by Defendant Kulp through the use of Jury-X's trade secrets.

8.     Jury-X recently learned that Defendant Kulp indeed formed that company, Defendant Tandem. Upon information and belief, Defendant Tandem is and has been operating as the alter ego of Defendant Kulp.

9.     Defendant Tandem's website shows that Defendant Tandem offers the same services as Jury-X and presents its services in the same way and with the same "look" as Jury-X.

10.     This can only mean one thing: Defendant Kulp has misappropriated and is wrongfully using Jury-X's trade secrets through and with Defendant Tandem.

2

11.    Jury-X became suspicious of Defendant Kulp's behavior after her resignation.  The reasons for this were many:

a.  When Defendant Kulp returned her Jury-X computer upon her resignation, she had wiped it clean, despite receiving no request nor instruction to do so.

b.  On March 28, May 20, and June 2, 2024, Jury-X employees spotted Defendant Kulp at the Raleigh-Durham International Airport and spoke to her on two of the three occasions.  When asked where she was headed, Defendant Kulp explained that she was traveling for her work with the Southeastern Fracture Consortium, an organization dedicated to promoting education and research in orthopedic trauma.  Later, however, Jury-X learned that Defendant Kulp had lied to cover up that she was actually performing jury analysis and selection services for at least two of Jury-X's clients for whom Defendant Kulp had worked with while employed with Jury-X.

c.  On June 4, 2024, Defendant Kulp was seen in a Hillsborough County, Florida courtroom with a Jury-X client.  Defendant Kulp was performing jury selection analysis.

d.  Jury-X immediately sent Defendant Kulp a cease-and-desist letter, attached as **Exhibit A.**

e.  In response to the cease-and-desist letter, Defendant Kulp admitted doing jury consulting work with several Jury-X clients in Florida and in Georgia.

f.  Defendant Kulp made certain assertions to try to escape culpability, but her assertions are either objectively false or are not believable.

3

g.  For example, Defendant Kulp claimed she did not use Jury-X's proprietary App or methodology, but rather was acting based on her "working history in jury selection industry outside of Jury-X…"  Yet Defendant Kulp never mentioned having prior knowledge or experience in jury selection, including in the three-page resume she submitted with her application to Jury-X, during her Jury-X hiring process, nor in her subsequent email and resume sent directly to Tiffany for client introductions after she was promoted.  Copies of both resumes she provided to Jury-X are attached as a composite **Exhibit B**.

h.  Defendant Kulp also claimed that she was hired by Jury-X clients as "trial support."  Yet Jury-X is unaware of Defendant Kulp having any trial experience at all (separate from jury consulting as she was taught by Jury-X), and she was seated apart from the trial team in a location consistent with Jury-X's methodology for placement in the courtroom for jury consulting services.

12.  Jury-X's suspicions that Defendant Kulp misappropriated Jury-X's trade secrets, was otherwise violating her agreements with Jury-X, and was violating statutory and common law have now been confirmed.

13.  Over the last few days and weeks, Jury-X has discovered the following:

a.  On the eve of her resignation, Defendant Kulp gave herself unauthorized, backdoor access to Jury-X files by connecting her personal email address to Jury-X's internal-only cloud-based server.

4

b. For almost nine months after her resignation, Defendant Kulp maintained her unauthorized backdoor access to at least one Jury-X compilation of Jury-X client, juror, and case-specific information (the "Trial Outcomes Data Table"). When Jury-X discovered in late August 2024 that Defendant Kulp had secretly linked her personal email to the Trial Outcomes Data Table, Jury-X immediately terminated that email address's access to Jury-X's cloud-based server as a whole.

c. There is no telling where, or when, Defendant Kulp may have given herself personal, backdoor access to Jury-X's cloud-based server, given the clearance Defendant Kulp had at Jury-X—but finding these traces of her trespass was troubling to Jury-X.

d. Then, just weeks ago, Jury-X discovered that in early February 2024, Defendant Kulp began the process of registering an LLC with the North Carolina Secretary of State, Defendant Tandem Legal Solutions. Defendant Kulp is Defendant Tandem's CEO. A copy of the Articles of Organization for Defendant Tandem is attached as **Exhibit C**.

e. Defendant Tandem's website is alarmingly similar to Jury-X's website, both in appearance and in the services advertised. Defendant Tandem offers services that almost perfectly overlap with the unique services that Jury-X provides. But Defendant Kulp and Defendant Tandem could not have created their own jury consulting system in such a short amount of time and

5

be providing these advertised services unless they were using Jury-X's trade secrets and other confidential information.[2]

    f.   Defendant Kulp has taken multiple steps to hide her involvement with Defendant Tandem: (1) Defendant Tandem's website makes no mention of Lauren Kulp, its Chief Executive Officer; (2) Defendant Kulp similarly makes no mention of her affiliation with Defendant Tandem on her LinkedIn page. A combined search of "Lauren Kulp" and "Tandem" through internet search engines does not bring up Defendant Tandem Legal Solutions' website nor any connection between Defendant Kulp and Defendant Tandem; (3) Defendant Kulp's response(s) to Jury-X's cease-and-desist letter omits mention of Defendant Tandem and implies that the work by Defendant Kulp in question were random "one off" engagements. Yet Defendant Kulp had already formed and, upon information and belief, was operating Defendant Tandem at the time of the cease-and-desist correspondence.

    g.   Within the last few weeks, two clients that Defendant Kulp serviced in the spring after her resignation also canceled trials that had been scheduled for Jury-X's to assist with. Upon information and belief, Defendants Kulp and

---

[2] The similarities in the websites and services offered, and the inability of Defendant Tandem and Defendant Kulp to offer these services without using Jury-X's trade secrets are described more fully in Section VII and exemplified in **Exhibits M, O, and P**.

Tandem performed or are performing jury selection services for these two trials.

h. Now, the threat to Jury-X is no longer theoretical—Defendants' use of Jury-X's trade secrets has resulted in direct loss of Jury-X's clients. Clients choosing Tandem, when they have historically used Jury-X, shows the similarities in both company's services.

14. Based on the recent discovery by Jury-X of this new information, on top of the incriminating information that Jury-X already possessed, Jury-X now brings this action against Defendant Kulp and Defendant Tandem to enjoin Defendants from continued use of Jury-X's trade secrets and other proprietary information so as to prevent irreparable harm to Jury-X, and for damages suffered by Jury-X related to Defendants' breaches of contract, statutory violations, and common law tortious activities.

## II.    PARTIES, JURISDICTION & VENUE

15. Jury-X is a North Carolina limited liability company, headquartered in Chapel Hill, North Carolina. Jury-X is wholly owned by Tiffany Prysock Devereux, its Chief Executive Officer, who is a resident of Chapel Hill, North Carolina.

16. Defendant Lauren E. Kulp is an individual residing at 37 Landover Circle, Chapel Hill, North Carolina. She is the CEO of Defendant Tandem and is its Registered Agent.

7

17.     Defendant Tandem Legal Solutions LLC[3] is a registered limited liability company in North Carolina.  Its registered agent is Defendant Kulp, and the address of both Defendant Tandem's Registered Office and Principal Office is 1710 E. Franklin St, #1175, Chapel Hill, NC 27514-5851.

18.     This Court has original subject matter jurisdiction pursuant to 28 U.S.C. §1331, the Defense of Trade Secrets Act, 18 U.S.C. §1836(c), and the Computer Fraud and Abuse Act of 1986, 18. U.S.C. § 1030. The Court has supplemental jurisdiction over the additional state law claims. 28 U.S.C. §1367(a).

19.     Venue is proper in North Carolina and in the Middle District of North Carolina because Jury-X and both Defendants reside within this District.

### III.     THE HISTORY OF JURY-X

20.     In 2009, newly minted journalist and photojournalist Tiffany Prysock Devereux helped her brother, an attorney, secure a multimillion-dollar jury verdict against Big Tobacco.  How?  By performing an extensive content audit of the *Chicago Tribune*. The goal? To cull as much evidence to support her brother's case theory that Big Tobacco (1) knew cigarettes caused cancer and (2) hired a public relations campaign to debunk studies linking cigarettes to lung cancer and other health problems.

21.     Following this success, Tiffany quickly became an essential resource for plaintiff-side tobacco litigators.  She worked with over 20 law firms who jointly and individually hired her for similar content audits of more than a hundred newspapers across

---

[3] Defendant Tandem is separate from Kulp's other business, Tandem Collaborative Wellness PLLC, that does not seemingly provide any services related to jury consulting.

the country, from *The New York Times* to small local papers. Upon information and belief, she was the first person to do this for plaintiff-side trial lawyers.

22. In 2013, Tiffany's brother came back to her again—but this time for a different reason. With his next trial looming, he told Tiffany that her research only mattered if the jurors themselves were open to the idea that cigarette users should be able to sue tobacco companies for using a product that, if used correctly, could kill them.

23. This singular question—is each juror open to holding a company responsible for damage its product caused?—was the lynchpin to securing a jury victory. So, he asked Tiffany to shift from focusing on newspapers to focusing on the jurors themselves—to study potential jurors on social media to determine which ones might *not* be open to the arguments and evidence in their case about Big Tobacco's marketing tactics. What information could she learn about *them* to guide him in eliminating biased jurors?

24. On the first day of voir dire, he gave her a list of 300 potential jurors to research. Tiffany knew that researching 300 individuals in such a short amount of time was impossible, so she came up with a plan to target 10 to 15 people on the list.

25. That experience made Tiffany explore how she could work more efficiently for the next trial—what information could she gather ahead of time? She thought about public records access and what public information was available that she could easily obtain. What sources provided the most useful data points to understand a juror's experiences and value system? How could the data be culled and streamlined? Could she develop a process to automate and expedite this gathering, research, and analysis? Could

9

she figure out information from people's online footprint that would demonstrate the characteristics and values people hold dear?

26.     With the answers to these questions, Jury-X was born.

27.     Tiffany spent 11 years and long hours of researching academic articles and books, constant learning, and regularly honing her processes for Jury-X to become the business it is today—a business that hundreds of lawyers rely on for insights into explicit and, especially, implicit juror bias.

28.     With a nod to her own transformative experiences with internships from undergraduate and graduate school, Tiffany endeavors to hire students of diverse backgrounds, both during and fresh out of school.

29.     Defendant Kulp was one of those hires.  Tiffany saw potential in Kulp—a new law graduate from Chapel Hill, who Tiffany believed shared the vision of leveling the legal playing field for plaintiffs who are often up against powerful corporations with unlimited resources.  Tiffany trained, promoted, and implicitly trusted Defendant Kulp as an employee of Jury-X.

30.     In return, Kulp robbed her.

31.     That robbery continues today, as Defendant Kulp and Defendant Tandem operate a knock off version of Jury-X, using the methodologies, trade secrets, and other confidential and proprietary information that Tiffany spent over a decade developing and refining.

10

## IV.   JURY-X'S BUSINESS, GENERALLY

32.    Jury-X went from humble beginnings to what it is today: a successful jury research and consulting company that hundreds of experienced plaintiff-side trial attorneys rely on for its methodologies in juror analysis, consulting, and selection for tort cases.

33.    Jury-X uses human and artificial intelligence to develop and assign easy-to-understand scores that assist Jury-X employees, known as Courtroom Liaisons, in creating a Strike Priority List™ for jury selection. Then, after a jury is sworn, Jury-X remains available to provide additional analysis to its attorney-clients to help craft a trial narrative that will resonate with specific empaneled jurors.

34.    Jury-X uses a multidisciplinary, data-driven approach—developed and refined over the course of a decade—overlaid with human intelligence crafted by Jury-X's guidelines, to identify juror biases to help guide its attorney-clients pre-voir dire, during voir dire, and post-voir dire. Jury-X compiles information derived from social sciences, legal theory, behavioral sciences, sociology, psychology, and communication theories, to evaluate juror biases and help Jury-X's attorney clients connect with jurors.

35.    This analysis is accompanied by a focused, multi-part protocol developed by Jury-X that combines case-related specifics with a pre-courtroom and in-courtroom protocol to create a comprehensive strategy for voir dire and trial presentations. Jury-X provides In-Depth Profiles to attorneys, so they may identify themes or perspectives that could resonate with jurors.

36.    The services Jury-X provides today can help civil litigators move the needle towards the ideals upon which the American jury system was founded.  Biased and unfair

11

decision-making by layperson jurors can result in injustice. And seating jurors with disqualifying characteristics (convicted felons, people who have lied on their questionnaires, etc.) can result in mistrials. Jury-X regularly works to prevent, and has prevented, such injustice and mistrials.

37. Jury-X's processes, protocols, and strategies are derived from Jury-X's investment of substantial time, effort, and resources.

38. Thus, this information constitutes Jury-X's trade secrets. Jury-X's proprietary processes, protocols, and strategies are defined in Paragraphs 41 through 56 below.

39. Since 2013, Jury-X has grown to a 70-person company that has provided jury research and analysis for more than 700 trials with more than 300 attorneys, in 26 states, using Jury-X's proprietary methods. Jury-X's mission is to provide accurate, speedy and in-depth knowledge for every potential juror is highly valued.

40. Jury-X's has been hired for cases arising from tobacco, product liability, medical malpractice, sexual assault and negligence, workplace discrimination, business litigation, motor vehicle collisions, premises liability, first-party breach of contract, nursing home, and mass tort. Jury-X has a stellar record with its clients, and those clients keep coming back to Jury-X for voir dire trial support.

## V.     JURY-X'S PROPRIETARY INFORMATION

### A. Jury-X's Trade Secrets

41. Jury-X's "Trade Secrets" are defined in Paragraphs 42 through 53 below, and they also encompass information owned by Jury-X, including but not limited to,

12

characteristics & values scores, technical data, formulas, patterns, compilations, programs, methods, techniques, processes, financial data, business plans, customer lists, or supplier details, that derives independent economic value from not being generally known or readily ascertainable by proper means by others who can obtain economic value from its disclosure or use.

42.     Attached as **Exhibit D** is a composite list of documents, spreadsheets, and other data that exemplify Jury-X's Trade Secrets.

43.     Jury-X uses many of the documents identified in **Exhibit D**, among other proprietary materials, to provide its unique three-phase Pre-Voir Dire, During-Voir Dire and Post-Voir Dire services (collectively "Jury Selection Services").

    a.  **Pre-Voir Dire Research (PVDR):** Jury-X created a proprietary process for compiling public records into a report using only the names from summons lists before voir dire begins. Though the data collected for PVDR starts the analysis, this is far from the final product for the clients. And while the PVDR is not available to clients in every state, it is available to Jury-X clients in Florida and Georgia.  Jury-X has created a PVDR Process Ecosystem, which reflects a multi-sourced data pool developed and refined by Jury-X that combines up to 200 data points of information curated by Jury-X (The "PVDR Process Ecosystem").  The PVDR Process Ecosystem is used by CoreTeam members and attached as **Exhibit E**.  Other written materials reflect the methodology underlying the PVDR Process Ecosystem, which are identified in **Exhibit D**.  Jury-X researchers also have access to a 42-page

13

Jury-X Research Handbook, that is not permitted to leave the Jury-X office, which walks through the PVDR process and includes information on scoring, formatting, social media research, and more. Excerpts of the Research Handbook are attached as **Exhibit F**.

b.    **During-Voir Dire Research (DVDR):** A Jury-X Courtroom Liaison attends voir dire and acts as a link between the attorney(s) in court and a remote Jury-X research team that has been taught Jury-X's proprietary methodologies.

   i.    The Jury-X researchers input data into a trial research data table created by Jury-X (the "Trial Research Data Table"). Screenshots from the Trial Research Data Table are attached as **Exhibit G**.

   ii.   Then, the Courtroom Liaison uses the Trial Research Data Table, in conjunction with other Jury-X proprietary materials, to create a Strike Priority List™ in real time based on the potential jurors' X-Bias Score™.

   iii.  The X-Bias Scale® reflects the methodology behind each X-Bias Score™. A copy of the X-Bias Scale® is attached as **Exhibit H**. Jury-X employees are provided with X-Bias Scale® Guidelines, which are identified in **Exhibit D**.

   iv.   This ultimately results in the Courtroom Liaison crafting an X-Bias Report™, which is a collection of curated categories to offer a "high level" overview in support of the X-Bias Scores™ for each juror. A

14

copy of the X-Bias Report™ and the formulas embedded therein is attached as **Exhibit I**.

    c.    **Post-Voir Dire Research:** After the jury is empaneled, Jury-X continues its research to provide trial attorneys with In-Depth Profiles and analysis of the communication styles of the seated jurors. This aids the trial attorneys in constructing a compelling narrative that will resonate with and be well-received by specific jurors. Further, if a fact develops over the course of the trial that could affect juror attitudes, Jury-X is on standby to perform additional research for the attorney clients. Examples of Jury-X's materials that assist in this process are identified in **Exhibit D.**

### B. The Time, Effort, and Value of Jury-X's Trade Secrets

44.    Over the course of 10-plus years, Jury-X has used its expanding experience and ongoing research to improve the protocols for identifying jurors before voir dire begins and to craft a comprehensive and personalized description of each individual juror.

45.    This years-long process culminated in Jury-X's creation of the X-Bias Scale®

46.    Unlike other jury consulting services that provide juror profiles based on information presented in the courtroom and a modicum of online research, Jury-X has a systemic approach that dives far below the surface and considers multiple traits and publicly available information for specific individuals and then, using Jury-X's own detailed list of human characteristics cross-referenced over multiple platforms, compiles

15

that data into a single score, based on the X-Bias Scale®, geared toward a specific case—this is the X-Bias Score™.

47.     Jury-X's processes have evolved significantly over time, incorporating continued research, ongoing analysis of scoring metrics and definitions; and building on Jury-X's own experience inside and outside of the courtroom on trials across the country. The result has been the development of efficient systems and protocols, with advanced formulas and innovative technology, for handling *pre-selection* juror research and analysis, as well as *contemporaneous* voir dire consulting and analysis, and *post-paneling* analysis and advice.   This combination derives economic value from not being known in the industry:  even if some of the constituent parts are publicly available, the compilation, weighing and analysis done by Jury-X is unique, confidential, and not publicly accessible.

48.     Jury-X's proprietary processes and information cannot be reverse-engineered or independently discovered without considerable effort, specialized expertise, and substantial resources.

49.     The intricate nature of these Trade Secrets, combined with the proactive steps taken by Jury-X to maintain their confidentiality, ensures that they remain unknown to competitors and retain significant economic value derived from their secrets.

50.     Jury-X's methods are different from standard jury consulting and jury research firms.  In particular:

        a.   Jury-X has created an extensive protocol for pre-voir dire research, assessment of data, and analysis of the potential jury pool, which includes:

i. Identifying highly specific profile characteristics that are relevant to a particular claim at issue in a specific case;

ii. Instituting a strict, multiple-pass protocol for compiling and reviewing data from publicly or commercially available sources;

iii. Populating an enormous cross-referencing spreadsheet or app to compile data into usable format and to assign values for each piece of information; and

iv. Combining 15-plus factors into a simplified score called the X-Bias Score™ to quickly identify jurors most likely disinclined or inclined to be open-minded to the plaintiff's facts of the particular case based on the characteristics and values determined by Jury-X Researchers and the Courtroom Liaison.

b. Jury-X has extensive training material and instruction to teach its employees what information is useful, how to find that useful information, how to most effectively and efficiently search social media and other online sources using advanced search techniques. *See* **Exhibit D**. Jury-X teaches its employees how to perform the analysis of the information compiled, how to combine the researched information with in-court responses and online resources, and how to both interpret and independently evaluate the scores assigned to jurors, including when and how to deviate from the automatically assigned score and why that deviation might be appropriate under a specific circumstance.

17

c. Jury-X developed quality-control procedures at each stage of the process to ensure consistent and dependable results in its research and scoring process.

d. Jury-X developed a software application (Jury-X's "App") to quickly compile and register the information gathered by its researchers. This application was launched in January 2023 to replace the 2013 system Tiffany developed, updated, and utilized through data tables.

e. Jury-X's employees with prior legal experience and those who have heightened knowledge of Jury-X's systems and protocols are often promoted and trained to be Courtroom Liaisons or Attorney Liaisons (jointly, "Courtroom Liaisons"). These Courtroom Liaisons travel to the courthouse for trial and are tasked with providing real-time guidance to the Jury-X researchers. They also are responsible for executing Jury-X's proprietary "rules" for implementing, modifying and interpreting Jury-X's X-Bias Scale® and Score.™ These Courtroom Liaisons interact directly with trial attorney-clients and staff to provide insight, guidance and strategy during voir dire. They inevitably become a valued resource for the trial attorneys.

f. Within both the formerly used spreadsheets and the Jury-X App, Jury-X also developed an interactive juror seating form, the "peremptory series," that permits the trial team and the researchers to keep track of jurors' positions and scores in real time as they are questioned, removed and/or excused. This is included in the Trial Research Data Table.

18

g. Once the jury is empaneled, Jury-X provides clients with the X-Bias Report™ that provides the client with a summary view of the results of the proprietary research methods that Jury-X applied on the empaneled jurors.

h. Clients may also request post-voir dire services in which Jury-X provides insights and strategy to aid trial attorneys in presenting their case to specific people in the panel of juror, as well as juror social media following to ensure they do not post anything about the ongoing trial.

51. Jury-X automated its proprietary analysis and scoring process through its App in 2022 and put the App into use in 2023.

52. The App assists the Trials Research Team in quickly combining compiled and scored cross-referenced data points. Many of these data points make up the X-Bias Report™. This report provides an easy-to-read summary of *information* with the X-Bias Score™; the basis for the jurors' scores, which by definition included the observations and intuitions of the Jury-X trained researchers and liaisons; the individually developed "Highlights;" and "Special Findings."

53. While the App is Jury-X's most recent product to assist and streamline its proprietary services, the App is derivative of the years-long research, formulas, characteristics & values scores, protocols, and processes reflected in Jury-X's spreadsheets and other documents stored on its cloud-based server, a sampling of which are attached to **Exhibit D**. All of these are part of Jury-X's Trade Secrets.

## C. Jury-X's Confidential Information

54. Jury-X is the exclusive owner of various proprietary works, including but not limited to software, written content, designs, and other creative materials, which are protected under applicable copyright laws. These works are original creations of Jury-X and have been developed through substantial investment of time, resources, and expertise. Jury-X takes the protection of these works seriously, employing rigorous measures to ensure that they are not unlawfully copied or distributed.

55. "Confidential Information," as used in this Verified Complaint, refers to any non-public information disclosed or made available to Defendant by Jury-X during the course of their relationship, whether through employment or any other agreement, and which non-public information is proprietary to Jury-X and provides a competitive advantage in the marketplace. This includes, but is not limited to, its Trade Secrets (defined and explained above), technical data, know-how, research, product plans, customer lists, marketing strategies, financial information, and any other business information that Jury-X has taken reasonable steps to protect and maintain as confidential.

56. This Confidential Information is explicitly covered and protected by the confidentiality and employment agreements Defendant Kulp signed, discussed below, and any other contracts or acknowledgements previously executed between Jury-X and Defendant Kulp, which require the Defendant Kulp to maintain the confidentiality of this information and prohibit its unauthorized use or disclosure.

**D. Jury-X's Protective Efforts**

57.     Jury-X takes numerous steps to protect its Trade Secrets and Confidential Information from disclosure.

   **a. For clients:**

      i. Jury-X requires clients to agree and acknowledge that Jury-X's work and products are confidential and proprietary and restricts both the current and future use of the Jury-X's work and product.  Specifically, clients agree and acknowledge that: (1) the formula, algorithms and software used and provided by Jury-X are proprietary property and confidential information; (2) Jury-X provides access to its proprietary property and confidential information for the client's current trial only; (3) no permission or license is given to reverse engineer Jury-X's proprietary property and confidential information; and (4) neither the client nor anyone associated with the client's trial shall share Jury-X's proprietary property and confidential information with others for any purpose.  A copy of this required acknowledgement is attached as **Exhibit J**.

      ii. Jury-X prohibits a client's access to the data underlying the score and provides end-results and highlights to explain the basis of its scoring methodology for the empaneled jurors.

      iii. Jury-X also requires its clients to have a Jury-X Courtroom Liaison present in person during the voir dire process, allowing Jury-X to

21

ensure that its strategies and methodologies that are visible to the client remain *only* with the client (which client has a contractual obligation to keep such information confidential).

**b. For employees/internal controls:**

    i. Upon hiring and before on-boarding and training, employees are required to sign confidentiality agreements highlighting and emphasizing the significance and confidential nature of the methodology and the protocols employees will be learning. Indeed, Defendant Kulp was responsible for collecting all employees' confidentiality agreements and ensuring they were executed and understood prior to allowing any new employee to begin training.

    ii. During training, Jury-X reiterates the confidentiality of the proprietary information to which the employees' conditionality agreements are applicable.

    iii. Documents are marked "Confidential" or "Confidential & Proprietary" and some bear strict admonishments not to remove the documents themselves from the Jury-X offices.

    iv. Employees are governed by an Employee Handbook, which states that Jury-X's "internal affairs are highly confidential" and that Jury-X's confidential information "was developed by the Company at great expense, is secret and confidential, is unique and is the exclusive property of the Company. Any improper disclosure or use of such

22

information would be wrongful and would cause irreparable harm and damage to the Company."

v. The Employee Handbook further provides that "Information designated as confidential may not be discussed with anyone outside the Company and may be discussed within the Company only on a 'need to know' basis."

vi. As employees are promoted and given increased visibility into Jury-X's proprietary information, they are subject to increasing levels of post-employment restrictions including non-solicitation and non-competition provisions. These agreements protect the intangible components of Jury-X's business and prevent inevitable disclosure of its Trade Secrets.

vii. Internal controls restrict access to spreadsheets, data sources and/or documents. Jury-X uses its cloud-based server to store all of their proprietary information on several individual drives. This allows Jury-X to share certain drives with specific groups of Jury-X employees and/or clients, all of whom have executed confidentiality agreements. If employees' positions change, resulting in a shift to their scope of work, Jury-X reassesses their access to certain drives, ensuring that employees' access is appropriately tailored at all times.

viii. Employees are required to use password protection to prevent outside access when using their Jury-X email anytime that employee logs into

23

a different computer within the office, an email is sent to top Jury-X leadership.

    ix.  The Jury-X employees also work in groups that are monitored for compliance with the employees' confidentiality obligations.

  c.  Jury-X's offices have four different suites: executive, internal operations, liaison, and research suites. Computer access is internally restricted so that access to highly confidential information is confined to the need-to-know employees.

58.    The above efforts reflect Jury-X's reasonable efforts to maintain the secrecy of its Trade Secrets and Confidential Information.

## E. The Independent, Economic Value of Jury-X's Trade Secrets and Confidential Information

59.    Since 2013, Jury-X has assisted in the selection of 700 juries. Jury-X's clients are typically seasoned attorneys who have been trying cases to juries for decades. These experienced trial attorneys recognize the value that Jury-X's proprietary methodologies adds to their representation of clients at trial.

60.    Jury-X's volume of work has increased considerably over the last eleven years. This increase shows the independent economic value that Jury-X receives from its processes, protocols and analysis being confidential and not accessible or generally known to the public.

61.    Until discovering the sudden existence of Defendant Tandem, Jury-X was not aware of any other jury consultation service providing the pre-voir dire, hands-on,

multi-faceted approach that Jury-X provides, making its processes (including, but not limited to the X-Bias Scale®) incredibly valuable in this industry and setting Jury-X apart from competitors.

62. While other jury consulting firms may offer some juror attitude analysis, and other companies may offer a product license that can be used by attorneys at trial, none provide both components in a singular service that combines all aspects of pre-, during, and post-voir dire analysis and assistance.

## VI. DEFENDANT KULP'S EMPLOYMENT WITH JURY-X

### A. Defendant Kulp's Employment Contracts

63. Jury-X hired Defendant Kulp, a recent law graduate, as a part-time researcher in 2019.

64. Defendant Kulp had a Juris Doctor and a master's degree in social work from the University of North Carolina, Chapel Hill. Defendant Kulp's resume shows she worked as a legal research intern at the Forsyth County District Attorney's office from August 2005 to June 2006. She continued at the D.A.'s office from January to September 2009.

65. Upon information and belief, Defendant Kulp did not perform jury research or selection prior to joining Jury-X.

66. Defendant Kulp never disclosed, in the interview process or otherwise, that she had any jury research or selection experience prior to joining Jury-X.

67. As a condition of her employment, Defendant Kulp signed a Confidentiality Agreement that protects Jury-X's detailed, proprietary processes, protocols and strategies.

25

A copy of this Confidentiality Agreement is attached to this Verified Complaint as **Exhibit K.**

68.     Jury-X promoted Defendant Kulp, eventually trusting her with training new researchers.  As part of this role, Defendant Kulp had access to Jury-X's Research Handbook as well as presentation materials that painstakingly guides new employees through Jury-X's proprietary methods.  These are included in **Exhibit D**.

69.     By 2022, Defendant Kulp had high-level access at Jury-X, entitling her to full access to most of the Jury-X drives.

70.     Each time Defendant Kulp was promoted, she signed a new agreement with additional confidentiality, non-solicitation, and non-competition provisions.   All Employment Agreements that Kulp signed are attached hereto as **Exhibit L.**

71.     In June 2023, Defendant Kulp requested that she step back from her full-time role with Jury-X and assume a part-time position.  This request was honored on June 9, 2023.

72.     Because the scope of Defendant Kulp's role at Jury-X changed, so did her access to the Jury-X drives.

73.     Jury-X removed Kulp's full access to one of the drives and instead changed her access to an individual document basis, to appropriately tailor her permissions to the typical access of a part-time employee.

74.     Defendant Kulp was noticeably upset by this change, something that confused Jury-X at the time.

75.     Between September and December 2023, Defendant Kulp had conflicts with her supervisors and complained about her work on multiple occasions.

76.     In November 2023, Tiffany attempted a heart-to-heart discussion with Defendant Kulp about Kulp's future with Jury-X. Tiffany told Kulp that they both needed to think about Kulp's role in the company and reconvene in December. On December 4, 2023, Defendant asked for another promotion. Her request was denied.

77.     Later that night, Defendant Kulp gave herself secret personal backdoor access to confidential information in one of Jury-X's drives that she still could access.

78.     She submitted her resignation the next day.

79.     Three days later, she returned her Jury-X computer with everything erased from it.

## B. Defendant Kulp's Access to Jury-X's Trade Secret and Confidential Information

80.     At all times, Defendant Kulp's "home base" for her work with Jury-X was in North Carolina. Other than traveling out of state for trials, Defendant Kulp's work with Jury-X was done from her offices in North Carolina.

81.     Defendant Kulp had access to all Jury-X clients nationwide and was in direct contact with likely more than 100 different attorney-clients in 2022 and 2023 while employed by Jury-X.

82.     It is not unusual for Jury-X's clients' cases to be continued for two or more years before actually going to trial. Jury-X also often works extensively with a client in preparation for a trial only to have the case settle prior to trial. Therefore, the hundreds of

trials on which Defendant Kulp provided some amount of written work product ("case notes") is not representative of all the attorneys with whom Defendant Kulp worked during that period.

83.     When Defendant Kulp was promoted, she also participated in weekly "traffic" meetings open only to Jury-X's CoreTeam members during which Jury-X's methodologies were tailored to fit specific upcoming cases.

84.     With this promotion, Defendant Kulp was responsible for training researchers in Jury-X's proprietary methodologies—which included the "human" part of the analysis that Jury-X had created—and she also participated in employee recruitment.

85.     In training researchers, Defendant Kulp had access to and utilized numerous proprietary and confidential slide presentations, manuals, handbooks, and information sheets, and trial spreadsheets—all of which reflected Jury-X's proprietary methodologies. These documents are identified in **Exhibit D**.  Defendant Kulp's access to this information was authorized through her Jury-X email, which was linked to the cloud-based server that hosted all Jury-X's Trade Secrets and Confidential Information.

86.     Defendant Kulp's access included access to certain specific drives on the Jury-X server:  General, (IDPs) In-Depth Profiles, ClientShared, CoreTeam, General, Liaisons, Office, Group Lead and some folders in Human Resources. As one of eight CoreTeam members at Jury-X, Defendant Kulp was given access to the CoreTeam drive. Fewer people were granted access to the other drives, depending on their role.

87.     Jury-X restricted access to the drives to those who needed them for work purposes, as these drives and the folders therein contained Jury-X's most sensitive information, including its Trade Secrets.

88.     At no point was Defendant Kulp authorized to have access via her personal email address to any of Jury-X's drives containing its Trade Secrets and Confidential Information, yet she gave herself that access late at night only hours before her resignation.

## VII.  DEFENDANT KULP'S RESIGNATION AND SUBSEQUENT ACTIONS

89.     After resigning, Defendant Kulp returned her Jury-X computer with everything wiped clean.

90.     Defendant Kulp wiped this computer on her own initiative; Jury-X had not requested that the computer be wiped, nor was it standard protocol for a departing employee to do so.  But by wiping the computer, Defendant Kulp removed all visible traces of any Jury-X Trade Secrets or Confidential Information that she may have downloaded to that computer and then transferred elsewhere.  As a result, Jury-X cannot view audit logs on files that no longer exist.

91.     Not long after her resignation, Defendant Kulp began offering Jury Selection Services to Jury-X's own trial attorney clients—something she could not do without relying on Jury-X's relationships and success, and its Trade Secrets and Confidential Information.

92.    After learning of Defendant Kulp's apparent contractual and statutory violations, Jury-X proposed several ways to Defendant Kulp to mitigate the situation while protecting Jury-X's assets.

93.    Jury-X also asked for confirmation in writing that Defendant Kulp would abide by her post-employment obligations and would not use, nor had continued access to, any of Jury-X's Trade Secrets or Confidential Information.

94.    Instead of working with Jury-X, Defendant Kulp rejected the confidential or trade secret nature of Jury-X's protocols and processes and attempted to diminish her responsibility by saying she did not use the Jury-X App.

95.    But the Jury-X App is simply a faster, condensed method of performing the work Jury-X designed, and is derivative of the other Confidential Information and Trade Secrets Defendant Kulp had access to during her tenure with Jury-X (and apparently continued to have access after her resignation through her linking of her personal email to Jury-X's server).

96.    Use of the Jury-X App itself does not answer whether, and to what extent, Defendant Kulp took with her and was utilizing (either on her own or through Defendant Tandem) Jury-X's other written strategies and protocols, identified in **Exhibit D**.

97.    In late July 2024, when pressed to see if she would abide by her obligations, Defendant Kulp refused to confirm either the obligations or her willingness to abide by them.

98.    The existence Defendant Tandem is not mentioned in Defendant Kulp's response, either expressly or impliedly.

30

99.    When Kulp resigned from Jury-X in December 2023, Jury-X believed that her access to Jury-X's Confidential Information and Trade Secrets terminated along with her Jury-X email—as that would have been the only authorized email account granting her access to the Jury-X server, drives, folders, and documents.

100.    But in late August 2024, Jury-X discovered Defendant Kulp's personal email address was linked to confidential Jury-X material on one of the drives.

101.    Jury-X subsequently determined that, on the night of December 4, 2023 (the very day Kulp had told Tiffany she was resigning), Defendant Kulp secretly linked her personal email to one of the Jury-X server drives, thus giving herself unauthorized personal backdoor access to document(s) on the drive otherwise only accessible to select top Jury-X employees.

102.    Then, in October 2024, Jury-X learned through a search of the North Carolina Secretary of State's business registry that Defendant Kulp created Defendant Tandem, a company that advertises on its website the same Jury Selection Services as Jury-X: www.tandemlegalsolutions.com.

103.    Defendant Kulp had hidden Tandem's existence from Jury-X: (1) Kulp kept her full name and biographical information conspicuously absent from Tandem's website; unlike most websites, there is no "About" page or a "Meet our Team" option; in fact, not a single person's name is listed on the Tandem website; (2) Kulp's LinkedIn profile does not list her affiliation with Defendant Tandem at all; (3) Kulp omitted any reference to Defendant Tandem in her response to Jury-X's cease and desist letter and suggested that her jury-related work was random, one-off engagements.

31

104.    Defendant Tandem can only be offering the services that it claims to be offering if it has use of Jury-X's Trade Secrets and Confidential Information that Defendant Kulp misappropriated.

105.    Having now discovered this evidence of Defendant Kulp's theft of and continued access to Jury-X's Trade Secrets and Confidential Information, Jury-X is filing this lawsuit and seeking injunctive relief to mitigate any further imminent and irreparable harm caused by Defendant Kulp's unlawful conduct.

## VIII.  DEFENDANT TANDEM LEGAL SOLUTIONS IS USING JURY-X'S TRADE SECRETS AND CONFIDENTIAL INFORMATION

106.    After discovering the existence of Defendant Tandem through the North Carolina Secretary of State's website, Jury-X was able to locate Defendant Tandem's website.

107.    Defendant Tandem's website is remarkably similar to Jury-X's website.

108.    Their logos are similar in color, shape, size, and location and both homepages include a partially visible "Lady Justice."

109.    The "tag line" used by Defendant Tandem is also similar to Jury-X's. *Compare*: "Winning starts when you Know Your Jury" taken from the Jury-X "The Process" webpage, *with* "Winning starts with the right strategy. Let's build yours" from Defendant Tandem's "Home" webpage.

110.    A comparison of Jury-X's home page and Defendant Tandem's home page is attached as **Exhibit M**.

32

111. But more troubling, the information on Defendant Tandem's website, including the services Defendant Tandem offers, confirms that Defendant Kulp, and now Defendant Tandem, have misappropriated and are using Jury-X's Trade Secrets and Confidential Information.

112. Like Jury-X, Tandem describes its "Process" with drop down explanations, mirroring the same three phase process created by Jury-X (pre-voir dire, during voir dire, and post-voir dire).

113. Screengrabs from Tandem's "Process" is attached as **Exhibit N**.

114. A comparison of both website's "processes" is attached as **Exhibit O**.

115. Defendant Tandem's Pre-Voir Dire process is a clear replica of Jury-X's Pre-Voir Dire process—and Jury-X is unaware of any other jury consulting firms who perform Pre-Voir Dire research.

116. Defendant Tandem's use of the term "Strike Strategy" is particularly incriminating because, upon information and belief, Jury-X is the only jury consulting business that provides a strike strategy. So much so that Jury-X has applied for a registered trademark for its strike strategy (the "Strike Priority List").

117. Jury-X requires the use of courtroom liaisons to interpret and advise on jury selection in court. Defendant Tandem's website notes that Tandem has courtroom liaisons available, but one place in which it differs from Jury-X is that Tandems offers to "provide expert guidance on voir dire and jury selection, helping you identify the best jurors and develop a strike strategy *without requiring our in-court presence.*" (Emphasis added.)

33

118. This description suggests that Tandem is sharing Jury-X strategies directly with attorneys. And unlike Jury-X, whose website requires interested clients to agree to the confidentiality of Jury-X's methods up front, Jury-X has seen no indication that Defendant Tandem protects the confidentiality of the Jury-X Trade Secrets that Defendant Tandem is already wrongfully using. In other words, Jury-X's Trade Secrets may be further disseminated beyond Defendants Kulp and Tandem because Tandem does not appear to protect this information like Jury-X does.

119. Another industry innovation is Jury-X's Post-Voir Dire services, described by Jury-X as follows:

> After the jury is selected, our team gets to work, analyzing the research. Why? We understand that connecting with jurors is key to winning their trust and persuading them to see your case in the most favorable light. We're here to support you in crafting a compelling narrative that will truly connect with the jurors and leave a lasting impact.

To Jury-X's knowledge, no other jury consulting services provide this type of support.

120. Defendant Tandem, however, is providing the same service. Defendant Tandem's description of "Panel Strategic Intelligence Briefs" is described as follows:

> We recognize the importance of having a deep understanding of the dynamics of your jury panel. Our Panel Strategic Intelligence Briefs provide comprehensive details on each juror selected for your panel. These *briefs are meticulously crafted after the jury selection process, offering critical insights and detailed analysis to support your trial strategy.* Trust Tandem Legal Solutions to *provide you with the detailed, actionable intelligence you need to navigate the complexities of your jury panel, enhancing your ability to secure a successful verdict.*

(emphasis added)

121. Jury-X does not know the full extent of Defendant Kulp's misappropriation of Jury-X's Trade Secrets. But the services offered by Defendant Tandem, many unique

34

to Jury-X and only possible through use of Jury-X's Trade Secrets, suggests that the misappropriation was massive in scale.

122.   **Exhibit P** connects the Confidential Information to which Defendant Kulp had access to a specific step in Defendant Tandem's "Process."

123.   So, too, does the speed at which Defendant Tandem was formed, created its process, and began doing business.   What it took Tiffany over a decade to form, Kulp formed in just a few months.

124.   Defendant Kulp left Jury-X in December 2023 and on February 6, 2024, began her application for the Tandem website. Kulp could not have independently created a completely unrelated methodology to offer Jury-X's services in this short period.

125.   In short, Jury-X paid Defendant Kulp (a) to learn its proprietary methods and strategies to conduct the research on potential jurors, (b) to advise attorney-clients on jury selection strategies without revealing Jury-X's Trade Secrets, and (c) to teach these proprietary methods to other Jury-X employees. Defendant Kulp turned around and stole Jury-X's significant investment of time and resources by resigning from Jury-X and then forming Defendant Tandem.  Defendants now are using Jury-X's wholly formed analytical methodologies for their own monetary benefit, and to Jury-X's detriment.

126.   A business that took more than a decade to grow—from a single journalist performing narrowly targeted investigative research, to a 70-person company—now must compete in a marketplace against a company surreptitiously formed by its former employee who took Jury-X's hard-earned, proprietary work product to offer a service at prices undercutting Jury-X.

35

127.    Kulp skipped right over the lengthy investment period and jumped to the head of the line, now able to offer a substantial discount to Jury-X's own clients for the same services, using Jury-X's Trade Secrets and Confidential Information.

128.    Jury-X is injured by Defendants' violations of the Federal Defense of Trade Secrets Act, as well as various state trade secrets acts, breaches of her contractual obligations, and by her efforts to cover up this malfeasance. Jury-X now seeks Court intervention to learn the full scope of Defendants' actions, and mitigate, and prevent further, irreparable harm from those actions to Jury-X's business.

129.    Jury-X seeks to enforce its legal rights and to stop the misappropriation of its Trade Secrets and Confidential Information and seeks compensation for the damages Jury-X sustained by Defendants' actions.

130.    Defendants' misappropriation was willful, malicious, and intended to harm Jury-X by gaining an unfair competitive advantage over Jury-X.

**COUNT I**
**Violation of Defense of Trade Secrets Act**
18 U.S.C. §1836(b)
[Defendants Kulp and Tandem]

131.    Jury-X hereby incorporates by reference the allegations in the preceding and subsequent paragraphs, as if more fully set forth herein.

132.    The federal law known as the Defense of Trade Secrets Act (the "Federal Act") protects businesses like Jury-X that develop proprietary methods that qualify for protection under the Act.

133.    Jury-X's products and services are used in interstate commerce.

36

134.   Jury-X's proprietary products, methods, processes, and services, defined above as Jury-X's Trade Secrets, constitute trade secrets under the Federal Act.

135.   Jury-X's products and services derive independent economic value from not being generally known to or readily ascertainable by proper means, which is evidenced by the fact that Jury-X has a winning record, seasoned trial attorneys continually and repeatedly pay for Jury-X's products and services, and Jury-X's business has exponentially increased since its inception in 2013.

136.   Jury-X's products and services were subject to efforts that are reasonable under the circumstances to maintain their secrecy: Jury-X instituted substantial internal and external controls to restrict access, use, and reproduction of its products and services.

137.   Defendant Kulp had a specific opportunity to acquire Jury-X's Trade Secrets while employed with Jury-X.  For example, Defendant Kulp had access to Jury-X's server drives, which contained all of Jury-X's proprietary methodologies.

138.   Further, Defendant Kulp had the opportunity to, and in fact did, abuse her access to Jury-X's Trade Secrets by giving herself unauthorized personal access to a Jury-X's server drive(s).

139.   Defendant Kulp thus had the opportunity to disclose and use Jury-X's Trade Secrets after her resignation.  Her unauthorized disclosure and use is two-fold: first, all Trade Secrets she downloaded or accessed via her personal email account or otherwise while employed at Jury-X; and second, all Trade Secrets she downloaded or continued to access and use after her resignation and the formation of Defendant Tandem.

37

140.    Defendant Kulp's opportunity to acquire Jury-X's Trade Secrets beyond her direct role as an employee of Jury-X, as described above and throughout this Verified Complaint, was without Jury-X's express or implied consent or authority.

141.    Defendant Tandem has access to Jury-X's Trade Secrets through its CEO, Defendant Kulp.

142.    As stated more fully above, upon information and belief, both Defendant Kulp and Defendant Tandem have already used Jury-X's Trade Secrets in performing jury research and selection services based in North Carolina and for Jury-X clients at trials in Florida and Georgia.

143.    Defendant Kulp has admitted that she does not recognize or intend to abide by her obligations under the law.

144.    Defendant Kulp is now offering services through Defendant Tandem that can only be offered through the use of Jury-X's Trade Secrets.

145.    Jury-X has been and will continue to be irreparably harmed by Defendants conduct through the loss of customers, goodwill, and competitive advantage in the space of jury selection services.

146.    Defendants' conduct is willful and malicious, as evidenced by, among other things, (a) Defendant Kulp intentionally "wiping" her company-issued laptop computer prior to returning it without having been asked or authorized to do so; (b) giving herself unauthorized personal access to Jury-X's server drive(s); (c) lying about her travel to work with Jury-X clients; (d) surreptitiously forming a company to offer the same unique services as Jury-X using Jury-X's trade secrets.

38

147. Jury-X is entitled to injunctive relief to prevent Defendants from continuing to use Jury-X's Trade Secrets.

148. Jury-X is entitled to an injunction barring Defendants from using Jury-X's Trade Secrets, now and in the future, especially in performing work that would compete directly with Jury-X, is appropriate.

149. Jury-X is entitled to damages for the loss caused by the misappropriation and for Defendants' unjust enrichment, as well as exemplary damage in the amount of two (2) times the damages assessed and reimbursement of attorneys' fees and costs incurred in enforcing Jury-X's rights.

WHEREFORE, Jury-X respectfully requests that this Court:

a. Enjoin Defendants from using Jury-X Trade Secrets now and in the future;

b. Compel Defendants to produce the electronic data in their possession or control for review;

c. Award Jury-X compensatory damages for all losses suffered due to Defendants' misappropriation;

d. Find that Defendants' attempts to hide their misappropriation entitles Jury-X to exemplary damages in the amount of two-times the actual damages;

e. Award Jury-X punitive damages;

f. Require Defendants to pay Jury-X's reasonable attorneys' fees and costs; and

g. For such other and further relief as this Court deems just and proper.

## COUNT II
## Violation of North Carolina Trade Secrets Protection Act
N.C.G.S. §§ 66-152, *et seq*.
[Defendants Kulp and Tandem]

150.    Jury-X hereby incorporates by reference the allegations in the preceding and subsequent paragraphs, as if more fully set forth herein.

151.    Jury-X's proprietary products, methods, processes, and services, defined above as Jury-X's Trade Secrets, constitute trade secrets under the North Carolina Trade Secret Protection Act.

152.    Jury-X's Trade Secrets derive independent economic value from not being generally known to or readily ascertainable by proper means, which is evidenced by the fact that Jury-X has a winning record, seasoned trial attorneys pay for Jury-X's products and services, and Jury-X's business has exponentially increased since its inception in 2013.

153.    Jury-X's Trade Secrets were subject to efforts that are reasonable under the circumstances to maintain their secrecy. For example, Jury-X instituted substantial internal and external controls to restrict access, use and reproduction of its products and services.

154.    Defendant Kulp had a specific opportunity to acquire Jury-X's Trade Secrets while employed with Jury-X. For example, Defendant Kulp had access to Jury-X's server drive(s), which contained all of Jury-X's proprietary methodologies.

155.    Further, Defendant Kulp had the opportunity to, and in fact did, abuse her access to Jury-X's Trade Secrets by giving herself unauthorized personal access to a Jury-X's server drive.

40

156.    Defendant Kulp thus had the opportunity to disclose and use Jury-X's Trade Secrets after her resignation.  Her unauthorized disclosure and use is two-fold: first, all Trade Secrets she downloaded or accessed via her personal email account or otherwise while employed at Jury-X; and second, all Trade Secrets she downloaded or continued to access and use after her resignation and the formation of Defendant Tandem.

157.    Defendant Kulp's opportunity to acquire Jury-X's Trade Secrets beyond her direct role as an employee of Jury-X, as described above and throughout this Verified Complaint, was without Jury-X's express or implied consent or authority.

158.    Defendant Tandem has access to Jury-X's Trade Secrets through its CEO, Defendant Kulp.

159.    Upon information and belief, Defendants have already used Jury-X's Trade Secrets in her performing jury research and selection services based out of North Carolina, and for Jury-X clients at trials in Florida and Georgia.

160.    Defendants have thus misappropriated Jury-X's Trade secrets.

161.    Further, Defendant Kulp has admitted that she does not recognize or intend to abide by her obligations under the law, thereby leading Jury-X to believe that Defendants' misappropriation is continuous and ongoing.

162.    Jury-X has been and will be irreparably harmed by Defendants' conduct through the loss of customers, goodwill, and competitive advantage in the space of jury selection services.

163.    Defendants' conduct is willful and malicious, as evidenced by, among other things, (a) Defendant Kulp intentionally "wiping" her company-issued laptop computer

41

prior to returning it without having been asked or authorized to do so; (b) giving herself unauthorized personal access to Jury-X's server drive(s); (c) lying about her travel to work with Jury-X clients; (d) surreptitiously forming a company to offer the same unique services as Jury-X using Jury-X's trade secrets.

164.    Jury-X is entitled to injunctive relief to prevent Defendants from continuing to use Jury-X's Trade Secrets.

165.    Jury-X is entitled to an injunction barring Defendants from using Jury-X's Trade Secrets, now and in the future, especially in performing work that would compete directly with Jury-X, is appropriate.

166.    Jury-X is entitled to damages for the loss caused by the misappropriation and reimbursement of attorneys' fees and costs incurred in enforcing Jury-X's rights.

WHEREFORE, Jury-X respectfully requests that this Court:

a.  Enjoin Defendants from using Jury-X Trade Secrets now and in the future;

b.  Compel Defendants to produce the electronic data in their possession or control for review;

c.  Award Jury-X compensatory damages for all losses suffered due to Defendants' misappropriation;

d.  Award Jury-X punitive damages;

e.  Require Defendants to pay Jury-X's reasonable attorneys' fees and costs; and

f.  For such other and further relief as this Court deems just and proper.

## COUNT III
## <u>Violation of Florida Uniform Trade Secret Act</u>
Fla. Stat. §688.001, *et seq*.
[Defendants Kulp and Tandem]

167.    Jury-X hereby incorporates by reference the allegations in the preceding and subsequent paragraphs, as if more fully set forth herein.

168.    Jury-X's proprietary products, methods, processes, and services, defined above as Jury-X's Trade Secrets, constitute trade secrets under the Florida Uniform Trade Secrets Act.

169.    Jury-X's Trade Secrets derive independent economic value from not being generally known to or readily ascertainable by proper means, which is evidenced by the fact that Jury-X has a winning record, seasoned trial attorneys continually and repeatedly pay for Jury-X's products and services, and Jury-X's business has exponentially increased since its inception in 2013.

170.    Jury-X's Trade Secrets were subject to efforts that are reasonable under the circumstances to maintain their secrecy.  For example, Jury-X instituted substantial internal and external controls to restrict access, use and reproduction of its products and services.

171.    Defendant Kulp had a specific opportunity to acquire Jury-X's Trade Secrets while employed with Jury-X.  For example, Defendant Kulp had access to Jury-X's server drive(s), which contained all of Jury-X's proprietary methodologies.

172.    Further, Defendant Kulp had the opportunity to, and in fact did, abuse her access to Jury-X's Trade Secrets by giving herself unauthorized personal access to Jury-X's server drive(s).

43

173.    Defendant Kulp thus had the opportunity to disclose and use Jury-X's Trade Secrets after her resignation.  Her unauthorized disclosure and use is two-fold: first, all Trade Secrets she downloaded or accessed via her personal email account or otherwise while employed at Jury-X; and second, all Trade Secrets she downloaded or continued to access and use after her resignation and the formation of Defendant Tandem.

174.    Defendant Kulp's opportunity to acquire Jury-X's Trade Secrets beyond her direct role as an employee of Jury-X, as described above and throughout this Verified Complaint, was without Jury-X's express or implied consent or authority.

175.    Defendant Tandem has access to Jury-X's Trade Secrets through its CEO, Defendant Kulp.

176.    Upon information and belief, Defendants have already used Jury-X's Trade Secrets in performing jury research and selection services for Jury-X clients at trials in Florida.

177.    Defendants have thus misappropriated Jury-X's Trade secrets.

178.    Further, Defendant Kulp has admitted that she does not recognize or intend to abide by her obligations under the law, thereby leading Jury-X to believe that Defendants' misappropriation is continuous and ongoing.

179.    Jury-X has been and will be irreparably harmed by Defendants' conduct through the loss of customers, goodwill, and competitive advantage in the space of jury selection services.

180.    Defendants' conduct is willful and malicious, as evidenced by, among other things, (a) Defendant Kulp intentionally "wiping" her company-issued laptop computer

44

prior to returning it without having been asked or authorized to do so; (b) giving herself unauthorized personal access to Jury-X's server drive(s); (c) lying about her travel to work with Jury-X clients; (d) surreptitiously forming a company to offer the same unique services as Jury-X using Jury-X's trade secrets.

181. Jury-X is entitled to injunctive relief to prevent Defendants from continuing to use Jury-X's Trade Secrets.

182. An injunction barring Defendants from using Jury-X's Trade Secrets, now and in the future, especially in performing work that would compete directly with Jury-X, is appropriate.

183. Jury-X is entitled to damages for the loss caused by the misappropriation and reimbursement of attorneys' fees and costs incurred in enforcing Jury-X's rights.

WHEREFORE, Jury-X respectfully requests that this Court:

a. Enjoin Defendants from using Jury-X Trade Secrets now and in the future;

b. Compel Defendants to produce the electronic data in their possession or control for review;

c. Award Jury-X compensatory damages for all losses suffered due to Defendants' misappropriation;

d. Award Jury-X punitive damages;

e. Require Defendants to pay Jury-X's reasonable attorneys' fees and costs; and

f. For such other and further relief as this Court deems just and proper.

45

## COUNT IV
## Violation of Georgia Trade Secrets Act of 1990
Ga. Code Ann. § 10-1-760, *et seq*.
[Defendants Kulp and Tandem]

184.     Jury-X hereby incorporates by reference the allegations in the preceding and subsequent paragraphs, as if more fully set forth herein.

185.     Jury-X's proprietary products, methods, processes, and services, defined above as Jury-X's Trade Secrets, constitute trade secrets under the Georgia Uniform Trade Secret Act.

186.     Jury-X's Trade Secrets derive independent economic value from not being generally known to or readily ascertainable by proper means, which is evidenced by the fact that Jury-X has a winning record, seasoned trial attorneys continually and repeatedly pay for Jury-X's products and services, and Jury-X's business has exponentially increased since its inception in 2013.

187.     Jury-X's Trade Secrets were subject to efforts that are reasonable under the circumstances to maintain their secrecy.  For example, Jury-X instituted substantial internal and external controls to restrict access, use and reproduction of its products and services.

188.     Defendant Kulp had a specific opportunity to acquire Jury-X's Trade Secrets while employed with Jury-X.  For example, Defendant had access to Jury-X's server drive(s), which contained all of Jury-X's proprietary methodologies.

189.     Further, Defendant Kulp had the opportunity to, and in fact did, abuse her access to Jury-X's Trade Secrets by giving herself unauthorized personal access to Jury-X's server drive(s).

46

190.    Defendant Kulp thus had the opportunity to disclose and use Jury-X's Trade Secrets after her resignation.  Her unauthorized disclosure and use is two-fold: first, all Trade Secrets she downloaded or accessed via her personal email account or otherwise while employed at Jury-X; and second, all Trade Secrets she downloaded or continued to access and use after her resignation and the formation of Defendant Tandem.

191.    Defendant Kulp's opportunity to acquire Jury-X's Trade Secrets beyond her direct role as an employee of Jury-X, as described above and throughout this Verified Complaint, was without Jury-X's express or implied consent or authority.

192.    Defendant Tandem has access to Jury-X's Trade Secrets through its CEO, Defendant Kulp.

193.    Upon information and belief, Defendant has already used Jury-X's Trade Secrets in her performing jury research and selection services for Jury-X clients at trials in Georgia.

194.    Defendant has thus misappropriated Jury-X's Trade secrets.

195.    Further, Defendant has admitted that she does not recognize or intend to abide by her obligations under the law, thereby leading Jury-X to believe that Defendant's misappropriation is continuous and ongoing.

196.    Jury-X has been and will be irreparably harmed by Defendant's conduct through the loss of customers, goodwill, and competitive advantage in the space of jury selection services.

197.    Defendants' conduct is willful and malicious, as evidenced by, among other things, (a) Defendant Kulp intentionally "wiping" her company-issued laptop computer

47

prior to returning it without having been asked or authorized to do so; (b) giving herself unauthorized personal access to Jury-X's server drive(s); (c) lying about her travel to work with Jury-X clients; (d) surreptitiously forming a company to offer the same unique services as Jury-X using Jury-X's trade secrets.

198. Jury-X is entitled to injunctive relief to prevent Defendants from continuing to use Jury-X's Trade Secrets.

199. Jury-X is entitled to an injunction barring Defendants from using Jury-X's Trade Secrets, now and in the future, especially in performing work that would compete directly with Jury-X, is appropriate.

200. Jury-X is entitled to damages for the loss caused by the misappropriation and reimbursement of attorneys' fees and costs incurred in enforcing Jury-X's rights.

WHEREFORE, Jury-X respectfully requests that this Court:

a. Enjoin Defendants from using Jury-X Trade Secrets now and in the future;

b. Compel Defendants to produce the electronic data in their possession or control for review;

c. Award Jury-X compensatory damages for all losses suffered due to Defendants' misappropriation;

d. Award Jury-X punitive damages;

e. Require Defendants to pay Jury-X's reasonable attorneys' fees and costs; and

f. For such other and further relief as this Court deems just and proper.

48

## COUNT V
## North Carolina Unfair and Deceptive Business Practices
N.C.G.S. § 75-1.1, et seq.
[Defendants Kulp and Tandem]

201.    Jury-X hereby incorporates by reference the allegations in the preceding and subsequent paragraphs, as if more fully set forth herein.

202.    Defendants have engaged in unfair methods of competition, by, at a minimum, using Jury-X's Trade Secrets and Confidential Information to compete at an unfair advantage with Jury-X in the marketplace.

203.    By taking Jury-X's industry-leading, proprietary methods, and offering and using those methods as her own, Defendants' actions have the capacity and tendency to deceive clients and cause confusion in the marketplace.

204.    Indeed, upon information and belief, Defendants are capitalizing on Defendant Kulp's former employment with Jury-X to secure new jury consulting jobs.

205.    Moreover, Defendants are doing so by offering Jury-X's product and services at a price that Jury-X cannot compete with, but that Defendants can offer, because they have not had to invest the same level of resources into creating her product and services due to Defendants' misappropriation of Jury-X's Trade Secrets and Confidential Information.  As a result, long-time Jury-X Clients are discontinuing their relationship with Jury-X because Defendants are offering the same thing, just cheaper.

206.    Defendants' conduct is also deceptive.  Defendant Kulp purposefully hid her connection to Tandem from Jury-X.  This included omitting mention of Defendant Tandem from Kulp's response to the cease and desist; failing to update Kulp's LinkedIn to reflect

49

her position as Tandem's CEO; and, upon information and belief, manipulating search engine optimization.

207. This conduct is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers.

208. Defendants' actions are in or affecting commerce, as Defendant Tandem and its CEO Defendant Kulp are based out of North Carolina but Defendants have already provided jury consulting services to Florida-based firms in both Florida and Georgia using Jury-X's Trade Secrets and Confidential Information.

209. For the actions described above and throughout this Verified Complaint, Defendants acted unfairly and in a deceptive manner, by using Jury-X's Trade Secret and Confidential Information without Jury-X's express or implied consent, and has done so willfully and maliciously by, among other things, gaining unauthorized access to Jury-X's server drive(s), wiping Defendant Kulp's computer to hide any personal download activity, and then making efforts to hide from Jury-X that Defendants were operating a business offering services identical to those offered by Jury-X.

210. Jury-X attempted to resolve this matter through its Cease-and-Desist Letter, but there has been an unwarranted refusal by Defendant Kulp (and by extension, Defendant Tandem) to fully resolve this matter.

211. Because of Defendants' conduct, Jury-X has suffered and continues to suffer damages in an amount to be proven at trial.

212. Defendants are also entitled to treble damages and attorneys' fees as a result of Defendant's conduct.

50

WHEREFORE, Jury-X respectfully requests that this Court:

a. Enter judgment in favor of Jury-X on this count;

b. Compel Defendants to produce the electronic data in their possession or control for review;

c. Award Jury-X compensatory damages, trebled, for all losses suffered due to her unfair or deceptive practices;

d. Require Defendants to pay Jury-X's reasonable attorneys' fees and costs; and

e. For such other and further relief as this Court deems just and proper.

**COUNT VI**
**Computer Fraud and Abuse Act of 1986**
18. U.S.C. § 1030
[Defendant Kulp]

213.   Jury-X hereby incorporates by reference the allegations in the preceding and subsequent paragraphs, as if more fully set forth herein.

214.   Defendant Kulp was provided a Company computer, tablet, and access to Jury-X's server drive(s), and other internal management systems for the sole purpose of completing her job duties as a Jury-X employee.

215.   Defendant Kulp executed her Confidentiality Agreement, employment agreements with confidentiality provisions, and agreed to abide by Jury-X's Employee Handbook, all which stated that she agreed not to use, in any way, Jury-X's Trade Secrets or Confidential Information, other than was necessary to perform her work for Jury-X.

216.   Defendant Kulp accessed Jury-X's Trade Secret and Confidential Information using her Company-issued computer, but then used that access, at a minimum to improperly, and without authorization from Jury-X, give herself outside access to Trade

51

Secrets and Confidential Information on Jury-X's server drive(s) by linking it to her personal email account.

217. By linking her personal email account to the Jury-X server drive(s), Defendant Kulp knowingly accessed Jury-X's Confidential Information and Trade Secrets without authorization and in excess of any authorized access while she was employed at Jury-X.

218. By keeping her personal email account linked to Jury-X materials after her resignation, Defendant Kulp knowingly had access to Jury-X's Confidential Information and Trade Secrets without Jury-X's authorization.

219. Through this unauthorized access, Defendant created the opportunity to obtain and, upon information and belief, obtained information protected from disclosure under the Federal Act and the various state trade secrets acts, identified above.

220. The above violates the Federal Fraud and Abuse Act of 1986.

221. Because of Defendant's violations under this act, Jury-X has suffered and continues to suffer irreparable harm, including but not limited to, loss of competitive advantage and damage to its business reputation.

WHEREFORE, Jury-X respectfully requests that this Court:

a. Enter judgment in favor of Jury-X on this count;

b. Compel Defendant to produce the electronic data in her possession or control for review;

c. Issue a permanent injunction preventing Defendant from continuing her unauthorized access to any Jury-X's server drive(s), consistent with subsection (g);

52

d. Award Jury-X compensatory damages for all losses suffered due to violation of 18. U.S.C. § 1030, consistent with subsection (g);

e. Award Jury-X punitive damages; and

f. For such other and further relief as this Court deems just and proper.

## COUNT VII
## North Carolina Computer Trespass
N.C.G.S. § 14-458(a)
[Defendant Kulp]

222. Jury-X hereby incorporates by reference the allegations in the preceding and subsequent paragraphs, as if more fully set forth herein.

223. Defendant Kulp was provided a Company computer, tablet, and access to Jury-X's server drive(s), and other internal management systems for the sole purpose of completing her job duties as a Jury-X employee.

224. Defendant Kulp executed her Confidentiality Agreement, employment agreements with confidentiality provisions, and agreed to abide by Jury-X's Employee Handbook, all which stated that she agreed not to use, in any way, Jury-X's Trade Secrets or Confidential Information, other than was necessary to perform her work for Jury-X.

225. Defendant Kulp accessed Jury-X's Trade Secret and Confidential Information using her Company-issued computer, but then used that access to improperly, and without authorization from Jury-X, give herself outside access to Jury-X's server drive(s), which contained Trade Secrets and Confidential Information, by linking it to her personal email account.

53

226. By linking her personal email account to the Jury-X server drive(s), Defendant knowingly accessed Jury-X's server without authorization and in excess of any authorized access while she was employed at Jury-X.

227. By keeping her personal email account linked to Jury-X materials after her resignation, Defendant knowingly had access to Jury-X's server drive(s) without Jury-X's authorization.

228. Through this unauthorized access, Defendant obtained information protected from disclosure under the Federal Act and the various state trade secrets acts, identified above.

229. The above constitutes computer trespass under N.C.G.S. § 14-458(a).

230. Because of Defendant's computer trespass, Jury-X has suffered and continues to suffer irreparable harm, including but not limited to, loss of competitive advantage and damage to its business reputation.

WHEREFORE, Jury-X respectfully requests that this Court:

a. Enter judgment in favor of Jury-X on this count;

b. Compel Defendant to produce her electronic data in her possession or control for review;

c. Award Jury-X compensatory damages for all losses suffered due to Defendant's computer trespass, consistent with N.C.G.S. § 14-458(c); and

d. For such other and further relief as this Court deems just and proper.

54

## COUNT VIII
## Breach of Contract – Confidential Information
[Defendant Kulp]

231.    Jury-X hereby incorporates by reference the allegations in the preceding and subsequent paragraphs, as if more fully set forth herein.

232.    Defendant Kulp entered into valid and enforceable confidentiality agreements with Jury-X, which included provisions to protect Jury-X's confidential and proprietary information as defined in this Verified Complaint and under the Federal Act and various state trade secrets acts identified above.

233.    Defendant Kulp breached this agreement by improperly disclosing and/or using Jury-X's Confidential Information without authorization, in violation of the express terms of her agreement and in contravention of Jury-X's rights under the Federal Act and various state trade secrets acts identified above.

234.    Because of Defendant's breach, Jury-X has suffered and continues to suffer irreparable harm, including but not limited to, loss of competitive advantage and damage to its business reputation.

WHEREFORE, Jury-X respectfully requests that this Court:

a.  Enter judgment in favor of Jury-X on this count;

b.  Compel Defendant to produce her electronic data in her possession or control for review;

c.  Award Jury-X compensatory damages for all losses suffered due to the breach;

d.  Award Jury-X reasonable attorneys' fees;

e.  Award punitive damages;

55

f.  Issue a permanent injunction preventing Defendant from further disclosing or using Jury-X's Confidential Information; and

g.  For such other and further relief as this Court deems just.

## COUNT IX
## <u>Breach of Contract – Non-Competition</u>
[Defendant Kulp]

235.  Jury-X hereby incorporates by reference the allegations in the preceding and subsequent paragraphs, as if more fully set forth herein.

236.  As part of the employment agreement between Defendant Kulp and Jury-X, Defendant Kulp agreed to a non-compete provision that restricted Defendant from engaging in competitive activities that could harm Jury-X legitimate business interests, particularly in relation to the protection of Jury-X's Trade Secrets and Confidential Information as defined under the Federal Act and various state trade secrets acts.

237.  The non-compete agreement was a critical element of Defendant Kulp's employment agreement and was reasonable in scope, duration, and geographic area, designed to protect Jury-X's Trade Secrets and Confidential Information.

238.  Specifically, given the intangible component to Jury-X's services and its use of "human" intelligence, non-compete agreements are the primary way Jury-X can prevent inevitable disclosure of its Trade Secrets.

239.  Defendant Kulp breached the non-compete by engaging in activities that directly compete with Jury-X, within the restricted area and twenty-four (24) month period, and in doing so, unlawfully used or threatened to use Jury-X's Trade Secrets protected under the Federal Act and various state trade secrets acts.

56

240. As a direct result of Defendant's breach, Jury-X has suffered and continues to suffer significant harm, including but not limited to, loss of competitive advantage, irreparable harm to its business interests, and potential misuse of its Trade Secrets and Confidential Information.

WHEREFORE, Jury-X respectfully requests that this Court:

a. Enter judgment in favor of Jury-X on this count;

b. Award Jury-X compensatory damages for all losses resulting from Defendant's breach;

c. Award Jury-X reasonable attorneys' fees;

d. Award punitive damages;

e. Issue a permanent injunction prohibiting Defendant from engaging in competitive activities that violate the non-competition agreement; and

f. For such other and further relief as this Court deems just and proper.

## COUNT X
## Breach of Contract – Non-Solicitation
[Defendant Kulp]

241. Jury-X hereby incorporates by reference the allegations in the preceding and subsequent paragraphs, as if more fully set forth herein.

242. As part of the employment agreement between Defendant Kulp and Jury-X, Defendant Kulp agreed to a non-solicitation provision that prohibited Defendant from soliciting Jury-X's clients, customers, and employees for twenty-four (24) months following the termination of employment. This provision was intended to protect Jury-X's

57

legitimate business interests, particularly in safeguarding Trade Secrets and Confidential Information as defined under the Federal Act and various state trade secrets acts.

243. The non-solicitation agreement was critical to protecting Jury-X's business relationships and confidential information, including its Trade Secrets, by preventing Defendant from using inside knowledge to undermine Jury-X's competitive position with existing and potential clients.

244. Defendant Kulp breached this provision by directly soliciting Jury-X's clients and/or employees, resulting in significant business losses for Jury-X.

245. As a direct result of Defendant Kulp's actions, Jury-X has suffered damages, including the loss of valuable business relationships and revenue.

WHEREFORE, Jury-X respectfully requests that this Court:

a. Enter judgment in favor of Jury-X on this count;

b. Award Jury-X compensatory damages for all losses resulting from Defendant's breach;

c. Award Jury-X reasonable attorneys' fees;

d. Award punitive damages;

e. Issue a permanent injunction preventing Defendant from further solicitation of Jury-X's clients, customers, or employees;

f. Require Defendant to pay Jury-X's reasonable attorneys' fees and costs; and

g. For such other and further relief as this Court deems just and proper.

## COUNT XI
## <u>Tortious Interference with Contractual Relationships</u>
[Defendant Tandem]

246.    Jury-X hereby incorporates by reference the allegations in the preceding and subsequent paragraphs, as if more fully set forth herein.

247.    Jury-X had valid and enforceable contractual relationships with Defendant Kulp, including contracts for confidentiality, non-solicitation, and non-competition. These contracts involved the protection of Jury-X's Trade Secrets and Confidential Information, which were critical to maintaining Jury-X's competitive advantage in the marketplace.

248.    Indeed, these contracts are necessary to protect the intangible components of Jury-X's business and prevent inevitable disclosure of Jury-X's Trade Secrets.

249.    Defendant Tandem was aware of these contractual relationships and the importance of Jury-X's Trade Secrets and Confidential Information and Jury-X's valuable business relationships protected under those agreements.

250.    Despite this knowledge, Defendant Tandem intentionally interfered with these contractual relationships by naming Defendant Kulp as its CEO, using Defendant Kulp to target Jury-X's Trade Secrets and Confidential Information, and causing Defendant Kulp to disclose Jury-X's Trade Secrets and Confidential Information in violation of her agreements.

251.    Defendant Tandem's actions constitute tortious interference with contractual relationships, as they were intended to and did result in the violation of Jury-X's non-competition, non-solicitation, and confidentiality agreements with Defendant Kulp and

resulted in the unauthorized use or potential use of Jury-X's Trade Secrets and Confidential Information, in violation of the Federal Act and various state trade secrets acts.

252.  Because of Defendant Tandem's tortious interference, Jury-X has suffered significant damages, including the loss of business relationships, revenue, and the misappropriation of its Trade Secrets.

253.  Defendant Tandem's interference was intentional, wrongful, and without justification, causing Jury-X to suffer significant financial and reputational harm.

WHEREFORE, Jury-X respectfully requests that this Court:

a.  Enter judgment in favor of Jury-X on this count;

b.  Award Jury-X compensatory damages for all losses suffered due to Defendant's tortious interference;

c.  Award Jury-X punitive damages; and

d.  For such other and further relief as this Court deems just and proper.

**COUNT XII**
**Unjust Enrichment**
[Defendants Kulp and Tandem]

254. Jury-X hereby incorporates by reference the allegations in the preceding and subsequent paragraphs, as if more fully set forth herein.

255. Defendants have unjustly benefited from the use and disclosure of Jury-X's Trade Secrets and Confidential Information without Jury-X's express or implied consent. These Trade Secrets and Confidential Information provided significant economic value to Jury-X due to their confidential nature.

60

256. Defendants' ability to "cut the line" in offering the same services as Jury-X only months after Defendant Tandem was formed is unjust and made possible only by Defendant Kulp's unscrupulous actions.

257. Defendant Tandem has additionally unjustly benefitted from hiring Defendant Kulp in violation of her non-competition agreement, which existed to prevent inevitable disclosure of Jury-X's Trade Secrets and Confidential Information to competitors who might hire Jury-X employees immediately upon those employees' resignation.

258. Defendants' enrichment is at the direct expense of Jury-X, who has suffered significant financial losses because of the misappropriation of its Trade Secrets.

259. It would be inequitable for Defendants to retain the benefits obtained through the wrongful use of Jury-X's Trade Secrets, which were acquired or used in violation of the Federal Act and various state trade secrets acts, identified above.

260. It would be inequitable for Defendants to retain the benefits obtained through the wrongful use of Jury-X's proprietary information.

WHEREFORE, Jury-X respectfully requests that this Court:

a. Enter judgment in favor of Jury-X on this count;

b. Order Defendants to pay restitution, disgorgement of profits, and other equitable relief as permitted;

c. Award Jury-X restitution for all financial losses suffered; and

d. For such other and further relief as this Court deems just and proper.

Dated: October 22, 2024

Respectfully Submitted,

By: */s/Parick M. Kane*
Patrick M. Kane (N.C. Bar No.36861)
Pkane@foxrothschild.com
Ashley Barton Chandler (N.C Bar No. 53381)
AChandler@foxrothschild.com

**FOX ROTHSCHILD LLP**
230 N. Elm Street, Suite 1200
Greensboro, North Carolina 27401
(336) 378-5200

*Margaret A. Gisch, Esq. (IL ARDC #6204431)
magisch@gct.law

**GOLAN CHRISTIE TAGLIA LLP**
70 West Madison Street, Suite 1500
Chicago, Illinois 60602
(312) 263-2300
*Special appearance under Local Rule 83.1(d)*
*forthcoming*

***Attorneys for Plaintiff Jury-X LLC***

62

## **VERIFICATION**

Tiffany P. Devereux states as follows: that she is over eighteen years of age and has not been declared incompetent; that she is the Founder, Managing Member, and CEO of JuryX, LLC; that she is authorized to make this verification on behalf of JuryX, LLC; and that she has read the foregoing Verified Complaint and knows the contents thereof to be true of her own knowledge or based upon records in the possession and custody of the limited liability company and therefore within the limited liability company's knowledge.

This the 22nd day of October 2024.

_____
Tiffany P. Devereux