IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF NORTH CAROLINA
Case No. 1:24-cv-00881

| | |
|---|---|
| **JURYX, LLC,** | |
| **Plaintiff,** | **BRIEF IN SUPPORT OF** |
| **v.** | **PLAINTIFF'S MOTION FOR** |
| | **PRELIMINARY INJUNCTION** |
| **LAUREN KULP; TANDEM LEGAL SOLUTIONS, LLC,** | |
| **Defendant.** | |

Plaintiff JuryX, LLC d/b/a Jury-X® ("Jury-X") submits this brief in support of its Motions for Preliminary Injunction.

## <u>INTRODUCTION</u>

"Imitation is the sincerest form of flattery that mediocrity can pay to greatness."[1] But when imitation is only possible with another's proprietary information, it is also the sincerest evidence of trade secret misappropriation. And all it pays is ongoing, irreparable harm.

Jury-X is not flattered that former employee, Defendant Lauren Kulp, gave herself backdoor access to Jury-X information on the eve of her resignation and wiped her Jury-X computer prior to returning it. Jury-X is even less flattered that Kulp has been competing with Jury-X in violation of her employment agreement. But Jury-X is devastated to have recently

---

[1] Oscar Wilde.

discovered that Kulp has copied Jury-X's entire business. Defendant Tandem Legal Solutions, LLC promotes the same services as Jury-X on a website with the same color scheme, same organization, and same imagery as Jury-X's own website. (Dkt. 1, ¶¶ 107–110; Dkt. 1-13.)

When Jury-X's founder Tiffany Devereux saw Tandem's website—outlining methodologies Jury-X created and developed over the last 11 years to fill a void in the jury consulting services market—she was furious, not flattered. Tiffany saw Jury-X's decade-long cultivation of a one-of-a-kind service being stolen by someone she had trusted. She saw a colleague, who once stood side-by-side with her, skip directly to the front of the line.

To prevent further theft and irreparable harm, Jury-X moves to enjoin Defendants from continued misappropriation of Jury-X's trade secrets.

## <u>NATURE OF THE MATTER</u>

Jury-X filed a Verified Complaint, (Dkt. 1), alleging federal and state trade secret misappropriation, violations of the North Carolina Unfair and Deceptive Business Practices Act, and breach of contract, among other things, seeking both injunctive and monetary relief against Defendants. Jury-X moves for preliminary injunctive relief to prevent Defendants' further use of Jury-X's trade secrets and/or confidential information, and other deceptive trade practices.

2

## STATEMENT OF THE FACTS

Over the last eleven years, Jury-X developed an approach to jury selection that is the first and only of its kind. (Dkt. 1 ¶ 2.) This multidisciplinary, data-driven approach is comprised of complex methodologies all aimed to identify juror biases and guide Jury-X's attorney-clients pre-voir dire, during voir dire, and post-voir dire. (*Id.* ¶ 34.) Jury-X's approach to providing accurate, speedy, and deep insights for every potential juror is highly valued; Jury-X's attorney-clients keep coming back. (*Id.* ¶¶ 39–40.)

For Jury-X to provide its services, Jury-X must train its employees in its methodologies. (*Id.* ¶ 50(b).) Thus, Jury-X has reduced many components of its trade to writing, in the form of guidelines, templates, checklists, protocols, data tables, and the like. (Dkt. 1-4.) It then teaches its employees—denoted by their primary roles ("researchers," "CoreTeam members" and "courtroom liaisons")—how to use Jury-X's methodologies at each point in its three-phase jury selection services (PVDR, DVDR, post-voir dire). (*Id.* ¶ 50(e).)

This is Jury-X's trade. (*Id.* ¶¶ 32–56.)

It is kept secret. (*Id.* ¶¶ 57–58.)

But Jury-X recently discovered that Kulp accessed Jury-X's Trade Secrets, (defined at *id.* ¶¶ 41–53), without authorization, kept access to some

Jury-X confidential material long after her resignation, and is now using these Trade Secrets to compete against Jury-X through Tandem. (*Id.* ¶ 13.) By these actions, Kulp is in violation of her Confidentiality Agreement. (*Id.* ¶¶ 67, 232, 233.)

Her culpability does not end there. Kulp created Tandem just nine weeks after she resigned from Jury-X. (*Id.* ¶ 13(d).) And within a few months, she has taken Jury-X clients from scheduled trials in Georgia and Florida. (*Id.* ¶ 141.) When she was caught, she lied. (*Id.* ¶ 11(h), 13(f).) She hid Tandem's existence from Jury-X. (*Id.* ¶ 13(f).) And yet, also within this time frame, Tandem launched its website (*Id.* ¶ 102), offering services identical to Jury-X's, (Dkt. 1-15).

The similarities are glaring and galling. Jury-X built its business on advertising its services in three parts: pre-voir dire, during voir dire, and post-voir dire. (Dkt. 1 ¶¶ 34, 43.) Tandem now offers the same. (Dkt. 1-14, 1-15.)

No company could realistically create a complex, multi-phase approach to jury analysis in such a short time. (*See* Dkt. 1 ¶ 27.) And it is impossible to believe that a company could verbatim replicate the proprietary processes of its CEO's former employer without using improperly acquired information. (*Id.* ¶ 68.)

Tandem's word choices throughout its website are dog whistles to Jury-X's proprietary methodologies. (*Id.* ¶ 1-16; Dkt. 5 pp. 90–93.) If Tandem is comfortable copying Jury-X's methodologies to this extent *publicly*, there is no telling what it is copying behind closed doors. Jury-X, therefore, has brought this action for misappropriation of its Trade Secrets, and now seeks a preliminary injunction to prevent Defendants from inflicting further, irreparable harm.

## QUESTIONS PRESENTED

I. Is Jury-X likely to succeed on the merits of its trade secrets claims against Defendants?

II. Is Jury-X likely to succeed on the merits of its breach of confidentiality agreement claim against Defendant Kulp?

III. Is Jury-X likely to succeed on the merits of its unfair and deceptive business practices claim against Defendants?

IV. Is Jury-X likely to suffer irreparable harm if Defendants are not enjoined from using Jury-X trade secrets?

V. Does the balance of equities favor Jury-X?

VI. Is enjoining Defendants from using Jury-X's trade secrets in the public interest?

## ARGUMENT

### Legal standard

An injunction is appropriate when a party shows (1) that it is likely to succeed on the merits of its claim; (2) that it is "likely to suffer irreparable

5

harm" in the absence of the injunction; (3) that "the balance of equities" tips in its favor; and (4) that an injunction is in the public interest. *Real Truth About Obama, Inc. v. Fed. Election Comm'n,* 575 F.3d 342, 346–47 (4th Cir. 2009), *vacated on other grounds*, 559 U.S. 1089 (2010*); Advanced Instructional Sys., Inc. v. Competentum USA, Ltd.*, 2015 WL 7575925, at \*3 (M.D.N.C. Nov. 25, 2015). "The weight to be given each factor varies according to the circumstances of each case." *James A. Merritt & Sons v. Marsh*, 791 F.2d 328, 330 (4th Cir. 1986). All four factors support enjoining Defendants from further use of Jury-X's misappropriated trade secrets and confidential information.

## I.   **Jury-X is likely to succeed on the merits of its trade secrets claims.**

Jury-X alleges violations of four trade secrets acts: the federal Defense of Trade Secrets Act ("DTSA"), and the state acts of North Carolina, Florida, and Georgia. All four statues authorize preliminary injunctive relief preventing actual or threatened misappropriation of a party's trade secrets. 18 U.S.C. § 1836(b)(3); N.C.G.S. § 66-154(a); Fla. Stat, § 688.003; Ga. Code Ann. § 10-1-762.

Under all four statues, a claim exists if the plaintiff proves (1) the existence of a trade secret; and (2) the defendant's misappropriation of the trade secret. *RLM Commc'ns, Inc. v. Tuschen*, 831 F.3d 190, 199 (4th Cir. 2016); *Penalty Kick Mgmt. v. Coca Cola Co.*, 318 F.3d 1284, 1290 (11th Cir.

6

2003); *Blades of Green, Inc. v. Go Green Lawn & Pest, LLC.*, 598 F. Supp. 3d 348, 355 (D. Md. 2022); *RxStrategies, Inc. v. CVS Pharmacy, Inc.*, 390 F. Supp. 3d 1341, 1351 (M.D. Fla. 2019). Under each, but with particular focus on the DTSA, Jury-X is likely to succeed on the merits of its claims. A preliminary injunction is warranted.

## A. Jury-X's trade secrets.

Jury-X's Trade Secrets, (Dkt. 1 ¶¶ 41–53), fall largely into four categories: its X-Bias Scale® Guidelines; templates; training material, checklists, and protocols; and databases. (Dkt. 1-4; Dkt. 5 pp. 17–20.) Together, this information allows Jury-X to train its employees and offer to its clients one-of-a-kind jury selection analysis. (Dkt. ¶ 43.)

The DTSA defines a "trade secret" as "financial, business, scientific, technical, economic or engineering information, including . . . designs, processes, [and] procedures" that "the owner thereof has taken reasonable measures to keep . . . secret." 18 U.S.C. § 1839(3). The state statutes' definitions are similar. *See* N.C.G.S. § 66-152(3); Fla. Stat, § 688.002(4); Ga. Code Ann. § 10-1-761(4). Under all, a trade secret is information that derives independent commercial value, not generally known, and is reasonably maintained under secret. 18 U.S.C. § 1839(3); N.C.G.S. § 66-152(3); Fla. Stat, § 688.002(4); Ga. Code Ann. § 10-1-761(4).

7

### i. *Jury-X's independent, commercial value.*

Biased and unfair decision-making by layperson jurors can result in injustice. (Dkt. 1 ¶ 36.) Jury-X forms its methodology around one goal: identifying potential juror bias to ensure litigants have a jury that will be open to the arguments of a particular case. (*Id.* ¶¶ 36–40.) Jury-X's methodology has proven effective, so its services are highly sought and valued. (*Id.* ¶ 39.) Jury-X has assisted in the selection of 700 juries, with its volume of work continuing to rise. (*Id.* ¶¶ 59–60.)

While other jury consultation services exist, Jury-X is not aware of any that provide pre-voir dire ("PVDR"), during-voir dire ("DVDR"), and post-voir dire services with multiple, proprietary data processes and human analysts actively assisting, in real time, through the voir dire process. (*Id.* ¶¶ 61–62.) Or, it *hadn't been aware*, until it discovered Tandem. (*Id.* ¶ 61.)

Jury-X's division of analysis by PVDR, DVDR, and post-voir dire is the core of its methodology, though during each phase, Jury-X offers unique and proprietary processes—each of which stand on their own as trade secrets. (*Id.* ¶ 43.) A sampling of Jury-X's Trade Secrets is Exhibit D to the Verified Complaint. (Dkt. 1-4; Dkt. 5 pp. 17–20.)

For **PVDR**, Jury-X created a methodology known as its "PVDR Process Ecosystem." (Dkt 1-5; Dkt. 5 pp. 21–22.) Jury-X trains a small team of

employees in the PVDR Process Ecosystem using a variety of written materials, including those identified at lines B.1–B.3 and C.15–19 of Exhibit D to the Verified Complaint. (Dkt. 1-4; Dkt. 5 pp. 17–20.) Jury-X researchers also have access to a Research Handbook—not permitted to leave the Jury-X office—that walks through the PVDR process. (Dkt. 1-6). Jury-X used considerable resources to develop these resources for its employees. (Dkt. 1 ¶ 50.) "The effort of compiling useful information is, of itself, entitled to protection[.]" *AirFacts, Inc. v. de Amezaga*, 909 F.3d 84, 96 (4th Cir. 2018) (quotation omitted). The PVDR Process Ecosystem, (Dkt. 1-5; Dkt. 5 pp. 21–22), is, as a whole, the type of process recognized as a trade secret. *Space Aero Prods. Co. v. R. E. Darling Co.*, 238 Md. 93, 105 (1965) ("The subject-matter capable of protection may be an industrial secret like a machine, process, or formula, or it may be industrial know-how [or] information of any sort. . . [or] the product of work, or expenditure of money, or of trial and error, or the expenditure of time.").

**DVDR** combines the work of Jury-X researchers with the work of Jury-X Courtroom Liaisons, wherein Jury-X deploys its Courtroom Liaisons to conduct additional, "real time," juror analysis based on Jury-X's specialized knowledge and methodologies. (Dkt 1 ¶ 43(b).) Liaisons are taught this information through comprehensive trainings. (*Id.* ¶ 50(b).) Jury-X's

proprietary X-Bias Scale® is utilized at this phase in its analysis. (*Id*.) X-Bias Scale® Scoring Guides and resources are provided to Jury-X Liaisons to help them identify X-Bias Scores™ for each juror. (Dkt. 1-4; Dkt. 5 pp. 17–20.) While the Liaison is in court, Jury-X researchers are off-site, inputting data into a Trial Research Data Table, embedded with numerous formulas reflecting Jury-X's unique approach to jury selection. (Dkt. 1-7; Dkt. 5 pp. 27–43.)

Jury-X's "specialized knowledge" in how it conducts its voir dire analysis is a trade secret. *See Static Control Components, Inc. v. Darkprint Imaging, Inc.*, 135 F. Supp. 2d 722, 727–28 (M.D.N.C. 2001) (concluding that "specialized knowledge" on processes, customer preferences, and concepts used in the plaintiff's industry were sufficient to show the existence of a trade secret). Methodologies used to improve efficiency have independent economic value and are trade secrets. *AirFacts*, 909 F.3d at 97.

**Post-Voir Dire**, after Jury-X provides clients with its X-Bias Report™, Jury-X will continue additional research for its clients as the case demands. (Dkt. 1 ¶ 43(c).) Not only is the X-Bias Report the type of data table with independent, economic value, but so too are each of the documents identified at C.40–44 in Exhibit D to the Complaint. (Dkt. 1-4; 1-9; Dkt. 5 pp. 17–20, 48–53.) These too are trade secrets because they include "personal insights and

10

analysis brought to bear through diligent research and by marshaling a large volume of information." *AirFacts*, 909 F.3d at 96 (quoting *Motor City Bagels, L.L.C. v. Am. Bagel Co.*, 50 F.Supp.2d 460, 473-79 (D. Md. 1999)).

This work product separates Jury-X from other jury consulting and research firms. (Dkt. 1 ¶¶ 46–53.) Jury-X's volume of work has increased significantly throughout the last decade, showing the independent economic value that Jury-X receives from its trade secret processes, protocols, and analysis. (*Id.* ¶ 39.)

Jury-X expends significant effort not only in developing its services, but also in building and maintaining its client relationships. Jury-X's client lists, for example, inform Jury-X not only of its customer base from which it might solicit additional business, but also allows Jury-X to maintain existing relationships by logging important client communications and case information. For example, the Trial Outcomes Data Table, (Dkt 1. ¶ 13(b)), includes a host of client information (including case names and other case-specific information, case-outcomes, juror names, and detailed client notes). This client information, and specific observations at trial, does not and could not exist independent of Jury-X. Jury-X's "client information qualifies as a trade secret under the DTSA." *Variable Annuity Life Ins. Co. v. Coreth*, 535 F. Supp. 3d 488, 515 (E.D. Va. 2021); *see also ATI Indus. Automation, Inc. v.*

11

*Applied Robotics, Inc.*, 801 F. Supp. 2d 419, 427 (M.D.N.C. 2011); *Spirax Sarco, Inc. v. SSI Eng'g, Inc.*, 122 F. Supp. 3d 408, 426 (E.D.N.C. 2015).

*ii.    Jury-X's efforts to maintain secrecy.*

Jury-X's protective efforts are numerous. (Dkt. 1 ¶ 57.) Both clients and employees acknowledge the proprietary nature of Jury-X's methodologies. (*Id*.) Clients sign an acknowledgement, (Dkt. 1-10), and employees sign confidentiality agreements, (Dkt. 1 ¶ 57(b)(i)). Access to Jury-X's Trade Secrets is limited to a need-to-know basis. (*Id*. ¶ 57(c).) For example, clients receive Jury-X's X-Bias Report™, (Dkt. 1-9; Dkt. 5 pp. 48–53), but do not receive the underlying Trial Research Data Table or all information in support of the X-Bias Scores™ for each juror, (*id*. ¶ 43(b)). Instead, the X-Bias Report™ offers the client a "high level" overview of Jury-X's analysis. (*Id*. 43(b)(iv).) Even so, the X-Bias Report™ is strictly confidential and may not be used by Jury-X clients in other trials. (*Id*. ¶ 57(a).) Courtroom Liaisons are present with the client during voir dire, allowing Jury-X to ensure its methodologies are not improperly shared. (*Id*. ¶ 57(a)(iii).)

Employees' access to Jury-X's Trade Secrets is also appropriately tailored to their positions. (*Id*. ¶¶ 73, 86). Researchers do not have access to the same materials as Courtroom Liaisons. (*Id*. ¶ 87.) The most confidential information is restricted to Jury-X's CoreTeam. (*Id*. ¶¶ 43(a), 86.) If an

12

employee's position changes, so does her access to Jury-X's Trade Secrets. (*Id.* ¶ 57(b)(vii).) If that employee is promoted, she may also sign a non-compete, acknowledging her greater visibility into Jury-X's Trade Secrets. (*Id.* ¶ 57(b)(vi).) If an employee takes a step back from a full-time position, her permissions will equally step back. (*Id.* ¶ 73.)

Jury-X documents are marked "Confidential and Proprietary." (*Id.* ¶ 57(b)(iii).) For example, *every page* of the Research Handbook states:



**CONFIDENTIAL** This document and the information contained within is proprietary information and trade secrets, It is not to be copied, conveyed or distributed to any third party without the express written consent of Jury-X LLC.

Documents reflecting Jury-X's Trade Secrets may not be removed from the Jury-X office. (Dkt. 1-6.) Access to documents on Jury-X's cloud-based server is only authorized through employees' Jury-X password-protected emails. (Dkt. 1 ¶¶ 57(b)(viii), 85.) If an employee logs into her Jury-X email on a different computer, an email is sent to Jury-X leadership. (*Id.*) In each of Jury-X's office suites, computer access is confined to the need-to-know employees. (*Id.* ¶ 57(c).) Each document listed in Exhibit D was subject to these controls. (Dkt. 1-4; Dkt. 5 pp. 17–20.)

These protective measures are adequate to maintain Jury-X's Trade Secrets. *See AirFacts,* 909 F.3d at 97 (requiring confidentiality agreements and monitoring employees' computers); *Merck & Co., Inc. v. Lyon*, 941 F. Supp.

13

1443, 1457 (M.D.N.C.1996) (similar); *Brightview Grp., LP v. Teeters*, 441 F. Supp. 3d 115, 129 (D. Md. 2020) (limiting employees' Trade Secrets access by position and through handbook policy); *Albert S. Smyth Co. v. Motes*, 2018 WL 3635024, at *4 (D. Md. July 31, 2018) (storing documents in password-protected Dropbox accounts).

### B. Defendants' misappropriation.

Despite Jury-X's efforts to maintain their secrecy, its Trade Secrets were improperly acquired by Kulp. Defendants then used Jury-X's Trade Secrets to unjustly compete and poach Jury-X clients. The DTSA provides that "a trade secret can be misappropriated when a person either (1) acquires a trade secret while knowing, or having reason to know, that the trade secret was acquired by improper means, 18 U.S.C. § 1839(5)(A), or (2) uses or discloses the trade secret after acquiring it through improper means, *id.* § 1839(5)(B)(i)." *Brightview Grp., LP*, 441 F. Supp. 3d at 132. The state statutes are similar. N.C.G.S. § 66-152(1); Fla. Stat, § 688.002; Ga. Code Ann. § 10-1-761. Under all, but with focus on the DTSA, Defendants have misappropriated.

### i. Kulp

As a high-level Jury-X employee by the end of her tenure, Kulp had access to more of Jury-X files than most. (Dkt. 1 ¶ 69.) Exhibit D to the Verified Complaint identifies dozens of documents to which Kulp had access,

14

due to her role on the CoreTeam. (Dkt. 1-4; Dkt. 5 pp. 17–20; Dkt. 1 ¶¶ 68–69, 86.)

Kulp's access was authorized through her Jury-X email, which was linked to the Jury-X server that hosted all Jury-X's tangible Trade Secrets. (*Id.* ¶ 85.) Regular access to the Jury-X server while employed with Jury-X establishes Kulp's specific opportunity to acquire Jury-X's Trade Secrets. *Advanced Instructional Sys.,* 2015 WL 7575925, at *3–4.

Kulp had access to all Jury-X clients nationwide and had direct contact with likely more than 100 different attorney-clients while employed by Jury-X. (Dkt. 1 ¶ 81.) Kulp also participated in weekly "traffic" meetings open only to Jury-X's CoreTeam members during which Jury-X's methodologies were tailored to fit specific upcoming cases. (*Id.* ¶ 83.) Kulp therefore did not just have the remote opportunity to acquire Jury-X's Trade Secrets—she had daily, up-close access to the information and visibility into their importance to Jury-X's trade.

Moreover, Kulp was directly responsible for recruiting, and then training researchers in Jury-X's proprietary methodologies. (*Id.* ¶ 84–85.) To conduct this training, she had access to and used the documents listed at C.8–10, 14, 22–23 and D.9 in Exhibit D. (Dkt. 1-4; Dkt. 5 pp. 17–20.)

15

As a trainer, Kulp knew the value Jury-X placed on its training methodologies. Indeed, the Research Handbook (Dkt. 1-6) that she used to train new Jury-X employees had warnings on the top, middle, and bottom of the pages:

- Top: "DO NOT LEAVE WITH THESE SHEETS"

- Middle: ". . . .*Under no circumstances* is this handbook to leave the Jury-X office."

- Bottom: "CONFIDENTIAL: This document and the information contained within is **proprietary information and trade secrets**, it is not to be copied, conveyed or distributed . . . ."

And in addition to signing her own confidentiality agreement, Kulp was responsible for collecting the executed confidentiality agreements of all Jury-X employees to whom she taught Jury-X's Trade Secrets. (Dkt. 1 ¶ 57(b)(i).) Kulp knew the information on Jury-X's server was its Trade Secrets. She had the opportunity to acquire Jury-X's Trade Secrets. And on the eve of her resignation, she did exactly that—by linking her personal email to one of the Jury-X drives, thus acquiring personal backdoor access to document(s) on the Jury-X internal drive. (*Id.* ¶¶ 88, 101.) Though Kulp wiped her computer, Jury-X recovered an audit log on one document—the Trial Outcomes Data Table—confirming Kulp's personal email was linked on December 4, 2023 and

16

remained linked until Jury-X's discovery of it in late August 2024. (*Id.* ¶¶ 100–01.)

If an employee is directed not to share information outside of her employer-issued devices (by agreement or policy), and does so anyways, misappropriation exists if the information was accessed or used for an improper purpose. *eShares, Inc. v. Talton*, 2024 WL 3970847, at *2 (S.D.N.Y. Mar. 29, 2024). There is no question Kulp was not permitted to link her personal email to Jury-X's server. (Dkt. 1 ¶ 88.) Her access to one document is sufficient. But Jury-X can infer Kulp acquired more than just this one document[2] based on her access to the *folder* containing other Trade Secrets, when this evidence is considered "within the larger constellation of facts[,]" including her decision to form a competing business. *Albert S. Smyth Co.*, 2018 WL 3635024, at *4.

Further, Kulp's acquisition was "improper." The DTSA defines "improper means" with terms like "theft" and "breach of a duty to maintain secrecy." 18 U.S.C. § 1839(6)(A).

Here, Kulp gave herself backdoor access to Jury-X's server *the night before* she resigned and *the same day* she was denied a requested promotion.

---

[2] Part of Jury-X's preliminary injunction seeks access to Defendants' devices; Jury-X cannot know what Defendants may or may not have accessed without this examination.

17

(*Id.* ¶¶ 76–78.)  The "closeness in time" between when she gave herself access and her departure creates "a strong inference" that she "exported these and other highly confidential and proprietary documents containing [Jury-X's] trade secrets" to her personal device.  *eShares*, 2024 WL 3970847, at *2.

Then, she wiped her computer to remove traces of what other documents she took with her.  (*Id.* ¶¶ 89–90.)

Next, she poached Jury-X clients.  (*Id.* ¶ 13(g).)

Along the way, she created a competing company, (*id.* ¶ 102; Dkt. 1-15; 1-16), using Jury-X's methodology to build it, (Dkt. 1-15; 1-16), but actively hiding its existence, (*id.* ¶ 98, 206).

Finally, when she was asked to abide by her contractual obligations, including not using Jury-X's Trade Secrets, she rejected their nature as trade secrets entirely.  (Dkt. 1 ¶¶ 93–94.)

This is "improper means" under the DTSA.  *Ameritox, Ltd. v. Savelich*, 92 F. Supp. 3d 389, 403 (D. Md. 2015) (finding likelihood to succeed on misappropriation where defendant has replicated the plaintiff's process and used plaintiff's data to build a competitor's database); *Brightview Grp., LP*, 441 F. Supp. 3d at 132 (same conclusion where defendant shared proprietary spreadsheets with third parties against company protocol); *TFC Partners, Inc. v. Stratton Amenities, LLC*, 2019 WL 369152, at *4 (W.D. Tex. Jan. 30, 2019)

18

(same conclusion when a former employee is now competing in the same market, doing the same work, for the same client); *eShares, Inc.*, 2024 WL 3970847, at *8 (compiling cases finding adequate evidence of misappropriation when a former employee wiped her laptop, or poached the plaintiff's clients, or departed right after acquiring access).

### ii. Tandem

Tandem's misappropriation flows from Kulp's. 18 U.S.C. § 1839(5)(A). A comparison of Tandem's services to Jury-X's services is the strongest evidence of misappropriation. Even if Jury-X had no direct evidence that Kulp improperly accessed Jury-X's server (it does), Tandem's very existence is evidence enough.

Exhibit O to the Complaint is a side-by-side comparison of Tandem's website to Jury-X's. (Dkt. 1-15.) The descriptions of their services are strikingly similar. To highlight a few:

Jury-X does extensive pre-voir dire research combining up to 200 data points of information curated by Jury-X. (Dkt. 1 ¶ 43; Dkt. 1-5, 1-6; Dkt. 5 pp. 21–22.) Tandem also conducts pre-voir research "to identify key characteristics." (Dkt. 1-15.)

During voir dire, "[a] Jury-X Liaison is right by [the client's] side." (*Id.*) This separated Jury-X from its competitors. (Dkt. 1 ¶ 62.) Until Tandem—whose "trial consultant will be in the courtroom with [the client]." (Dkt. 1-15.)

Jury-X's Liaison uses the Trial Research Data Table to research "in real time" and deliver an X-Bias Score® on every potential juror. (*Id.*) Tandem conveniently also provides "real-time feedback and strategic adjustments." (*Id.*)

Jury-X uses a Strike Priority List™. (*Id.*) Tandem offers a Strike Strategy. (*Id.*)

Post-voir dire, Jury-X produces its X-Bias Report™, which it describes as a high-level overview of Jury-X's research. (Dkt. 1 43¶ (b)(iv).) Tandem offers the same service and provides the same "high-level report." (Dkt. 1-15.)

Exhibit P to the Complaint connects each service offered by Tandem to a document that Kulp had access to while at Jury-X via the Jury-X server. (Dkt. 1-16.) The very server she improperly accessed on the eve of her resignation. (Dkt. 1 ¶ 13(a).) Evidence that Tandem is offering an almost identical competing product and referencing Jury-X's proprietary software is evidence of misappropriation. *See Advanced Instructional Sys., Inc.*, 2015 WL 7575925, at *3 ("[T]hat [the defendants] are not only attempting to create their own [competing product], but that they also have specifically and repeatedly

20

referenced proprietary terminology from the trade secrets . . . as well as attempted to break down and replicate [the plaintiff's] internal architecture [is evidence of misappropriation].").

So, too, is the speed at which Tandem was able to develop this methodology: it suggests that Tandem has used Jury-X's Trade Secrets to build its own "data base" for jury consultation research and analysis. *Ameritox*, 92 F. Supp. 3d at 403.

For these reasons, Jury-X is likely to succeed on its trade secrets claims.

## II. Jury-X is likely to succeed on its claim that Kulp breached her confidentiality agreement.

Jury-X's breach claim will be similarly successful. Kulp's agreement protects Jury-X's Confidential Information *beyond* just its Trade Secrets. (Dkt 1-11 ¶¶ 1, 5, 9.) It defines Jury-X's Confidential Information to include its techniques, processes, data, reports, and client information. (*Id.* ¶ 1.) It also includes materials that are "independently developed" by others if those materials include Jury-X's confidential information. (*Id.* ¶ 2.) Every document on Exhibit D to the Complaint meets the definition of Confidential Information. (Dkt. 1-4; Dkt. 5 pp. 17–20; Dkt. 1 ¶¶ 42, 53, 68, 85, 96.)

Kulp agreed not to exceed her authority in accessing Jury-X Confidential Information. (Dkt. 1-11 ¶¶ 5(a), 9.) When she gave herself backdoor, personal access to Jury-X's server, she breached that agreement.

21

She continued to breach her agreement when she kept access to the Trial Outcomes Data Table for eight months after her resignation. (Dkt. 1 ¶¶ 99–100.) This Data Table contains Jury-X's Confidential Information, including:

- Client information (case names, location of trials, the attorneys on the case, the type of case, and the outcome of the case);

- Name of the foreperson on each jury for each case worked;

- Specific notes on sworn jurors; and

- Specific notes on attorney-clients, including their temperaments, behaviors, typical voir dire strategy (including details such as whether the attorney is "strike happy" or not), and specific comments they made during the trial.

Beyond this one document, as with Jury-X's trade secrets claim, Tandem's website is additional evidence of Kulp's breach. (*See* Dkt. 1-15; 1-16; Dkt. 5 pp. 90–93.) A former employee's post-employment actions can be evidence of misappropriation of confidential information. *See Ameritox,* 92 F. Supp. 3d at 403; *QSP, Inc. v. Hair*, 152 N.C. App. 174, 177 566 S.E.2d 851, 853–54 (2002).

For these reasons, Jury-X is likely to succeed on the merits of its breach of confidentiality claim.

22

### III. Jury-X is likely to succeed on its claim that Kulp and Tandem violated the North Carolina Unfair and Deceptive Business Practices Act.

Jury-X's likelihood of success on misappropriation informs one basis for its success on UDP. Trade secret misappropriation is a violation of N.C.G.S. § 75-1.1. *See Static Control Components, Inc. v. Darkprint Imaging, Inc.*, 240 F. Supp. 2d 465, 487 (M.D.N.C. 2002); *Drouillard v. Keister Williams Newspaper Servs., Inc.*, 108 N.C. App. 169 (1992).

But Jury-X's UDP claim is likely to succeed independent of any trade secret analysis. *The Country Club of Johnson County v. U.S. Fidelity & Guaranty Co.,* 150 N.C. App. 231, 563 S.E.2d 269 (2002).

Competitors may not compete unfairly. "Competition, like any fuel not properly contained and utilized, can become destructive." *Sunbelt Rentals, Inc. v. Head & Engquist Equip., LLC*, 2003 WL 21017456, at *1 (N.C. Super. May 2, 2003). Even if not using Jury-X's trade secrets, Defendants' use of Jury-X's confidential information to compete is unfair competition barred by section 75-1.1. *Charah, LLC v. Sequoia Servs.*, LLC, 2020 WL 1903953, at *9 (N.C. Super. Apr. 17, 2020) (compiling cases).

Defendants' conduct is also deceptive. Kulp took great pains to hide her connection to Tandem from Jury-X. She:

23

- lied about why she was traveling, to cover up that she was performing jury analysis for two of Jury-X's clients, (Dkt. 1 ¶ 11(b));

- suggested, later in her response to Jury-X's cease and desist, that her jury consulting work was one-off engagements, (*id.* ¶ 103);

- omitted in that same response any mention of Tandem, despite it being a registered LLC at that time, (*id.* ¶ 98);

- excludes her full name, headshot, and bio from Tandem's website, (*id.* ¶ 103);

- manipulates search engine optimization so that "Lauren Kulp" and "Tandem" together do not generate Tandem Legal Solutions' website, (*id.* ¶¶ 13(f), 206); and

- fails to mention Tandem on her LinkedIn, despite being its CEO, (*id.* ¶ 103).

This misleading and deceptive conduct supports Jury-X's UDP claim. Based upon this evidence, Jury-X is likely to succeed on this claim too.

## IV. Jury-X will suffer imminent and irreparable harm in the absence of injunctive relief.

Kulp's actual and threatened misappropriation, coupled with Tandem's apparent use of Jury-X's Trade Secrets and Confidential Information in

24

competing with Jury-X, is a "clear showing" of Jury-X's actual and immediate irreparable harm. *Philips Elecs. N. Am. Corp. v. Hope*, 631 F. Supp. 2d 705, 711 (M.D.N.C. 2009). "Loss of permanent relationships with customers and loss of proprietary information may constitute irreparable harm." *Id.* (compiling cases); *see also TSG Finishing, LLC v. Bollinger*, 238 N.C. App. 586, 595, 767 S.E.2d 870, 877 (2014) (holding that continued access to trade secrets when defendants were planning to leave a company and then compete against it "is precisely the type of threatened misappropriation, if not actual misappropriation," that the trade secrets act aims to prevent through issuance of a preliminary injunction).

Defendants are offering the same services as Jury-X, but cheaper. (Dkt. 1 ¶ 205). They can do this because they have expended none of the time, resources, nor costs associated with building and developing those services. (*Id.* ¶ 121). And longtime Jury-X clients are discontinuing their relationship with Jury-X because of Tandem's cheaper, similar offering. (*Id.* ¶ 13(g).)

Jury-X acquired, refined, and perfected its methodologies for over a decade. (*Id.* ¶¶ 125–127.) Yet, by misappropriating Jury-X's Trade Secrets and Confidential Information, Tandem was able to form and offer these identical services in a matter of only months. (*Id.* ¶ 124.) This shows Jury-X's vulnerability if Defendants are not enjoined. And it also highlights the unfair

25

competitive advantage Tandem—or any other entity Kulp creates or employee Kulp hires—receives in absence of an injunction. *Philips*, 631 F. Supp. 2d at 711. This unfair competitive advantage, to a defendant or a third party, is irreparable harm. *Id.* at 711–12. So, too, is Jury-X's loss of goodwill through dilution of its uniqueness in the marketplace. *Id.*

More troubling, Tandem's website suggests that Kulp and Tandem are directly sharing with clients Jury-X strategies it has copied *without having those clients agree to maintain that information as confidential.* (Dkt. 1 ¶ 118.) This highlights the prejudice to Jury-X: it no longer is the keeper of its Trade Secrets and Confidential Information. Because secrecy is an essential element to a trade secret, Jury-X's harm is immediate if it cannot regain possession of its information.

In sum, irreparable harm here is simple: "a trade secret, once lost is, of course, lost forever." *Home Funding Grp., LLC v. Myers*, 2006 WL 6847953, at *2 (E.D. Va. Dec. 14, 2006). This equally and "logically applies to the disclosure of confidential information[.]" *Id.*; *see also Zahodnick v. Int'l Bus. Machines Corp.*, 135 F.3d 911, 915 (4th Cir. 1997) (affirming permanent injunction enjoining defendant from disclosing confidential materials to third parties and ordering defendant to return all confidential material to plaintiff). To prevent

Jury-X from irreparably losing the value of its unique jury consulting methodology, an injunction must be granted.

## V.  The balancing of hardships is in Jury-X's favor.

"[T]he balancing of hardships must be analyzed conceptually before and separately from the likelihood of success on the merits," but nonetheless these factors "must work in conjunction." *Ciena Corp. v. Jarrard*, 203 F.3d 312, 323 (4th Cir. 2000). "If the hardship balance tilts sharply and clearly in the plaintiff's favor, the required proof of likelihood of success is substantially reduced." *Id.*

Jury-X requests through this injunction only that Defendants not keep and use Jury-X's Trade Secrets and Confidential Information. But Jury-X (and this Court) can only be assured of this through forensic examination of Defendants' computers[3] and a prohibition on Defendants' continuing to

---

[3] Jury-X seeks only temporary possession of Defendants' electronic devices, which is not civil seizure because Defendants will not be permanently deprived of their devices during the pendency of this lawsuit, nor will their devices be taken into custody of the court. 18 U.S.C. § 1836(b)(2). Rather, Jury-X seeks Defendants' devices for copying and inspection, as Jury-X would be entitled to in discovery. Fed. R. Civ. Pro. 26(b), 34. The added assurance here is that Jury-X's expert would not just copy and inspect the devices for discovery into Jury-X's claims, but would additionally remove Jury-X's confidential information from the devices to ensure Defendants no longer have improper access to the information.

27

compete with Jury-X while that examination is ongoing.[4]  That is the entire scope of what Jury-X seeks.

Jury-X will suffer irreparable harm if Defendants are allowed to continue to use Jury-X's Trade Secrets and Confidential Information while this case progresses.  On the other hand, an injunction would not prejudice Defendants.  In fact, Jury-X's proposed injunction "only require[s] [Kulp] to do that which [she] agreed to do" in her agreement and would only prevent her and Tandem "from engaging in illegal and unethical conduct." *See Philips*, 631 F. Supp. 2d at 712.  If Tandem cannot function without Jury-X's proprietary information, then that is a symptom of its culpability, not a hardship.

## VI. Public interest supports enjoining Defendants from using Jury-X's trade secrets and confidential information.

The thread of free competition is woven throughout our federal and state statutes and constitutions.  But free competition equally means competition free from theft.  Indeed, while North Carolina prohibits restraint of trade in N.C.G.S. § 75-1, it is proceeded by N.C.G.S. § 75-1.1, noting that competition cannot be unfair or deceptive.  The public's interest in protecting one's ability

---

[4] If Defendants can continue to provide services other than jury selection without using Jury-X's trade secrets and confidential information during the pendency of the forensic exam, they can do so.  But it is difficult to envision how they could do any jury selection considering the inextricability between (1) Jury-X's trade secrets and confidential information and (2) the services Defendants' offer under Kulp's direction.

to compete necessarily includes protecting another's proprietary information. One cannot exist without the other. "[T]he public interest is served by allowing firms to protect trade secrets and confidential information, and by providing a forum to seek temporary injunctive relief to enjoin any further breach or disclosure, potentially causing irreparable harm and destroying incentives to innovate." *Home Funding Grp., LLC*, 2006 WL 6847953, at *3.

Jury-X cannot compete if it cannot protect the methodologies, processes, and data that allowed it to enter and rise in the marketplace. Jury-X's interest thus substantially outweighs Defendants' interest in competing through use of Jury-X's Trade Secrets and Confidential Information. *See Red Valve, Inc. v. Titan Valve, Inc.*, 2018 WL 1830503, at *14 (N.C. Super. Apr. 10, 2018), as corrected (Apr. 17, 2018) ("[I]t is clear that Defendants' actual and threatened misappropriation of Plaintiffs' Trade Secrets, if not enjoined, will damage Plaintiffs' business, adversely impact [Plaintiffs'] market position, and dull its competitive advantage. That injury is not one to which [Plaintiffs] should be required to submit." (internal brackets omitted)).

Defendants "only stand to lose benefits unjustly gained." *Home Funding Grp., LLC*, 2006 WL 6847953, at *2. The injunction here is limited to preventing further, irreparable loss to Jury-X's livelihood—nothing more.

29

Thus, "the public interest is not violated by injunctive relief, but instead is served." *Id.* at *3.

## VII.  <u>CONCLUSION</u>

Jury-X has shown evidence of Defendants' violations of state and federal law and the resulting irreparable erosion of Jury-X's business.  If Jury-X must wait for a resolution of this dispute on the merits to protect its Trade Secrets and Confidential Information, Jury-X will have nothing left to protect. Accordingly, Jury-X requests preliminary injunctive relief as set forth in the Motion.

Dated: October 24, 2024.

Respectfully submitted,

By<u>:  /s/ Parick M. Kane </u>
Patrick M. Kane (N.C. Bar No.36861)
Pkane@foxrothschild.com
Ashley Barton Chandler (N.C Bar No. 53381)
AChandler@foxrothschild.com

**FOX ROTHSCHILD LLP**
230 N. Elm Street, Suite 1200
Greensboro, North Carolina 27401
(336) 378-5200

*Margaret A. Gisch, Esq. (IL ARDC #6204431)
magisch@gct.law

**GOLAN CHRISTIE TAGLIA LLP**
70 West Madison Street, Suite 1500
Chicago, Illinois 60602
(312) 263-2300

30

*Special appearance under Local Rule 83.1(d) forthcoming*

**Attorneys for Plaintiff Jury-X LLC**

## CERTIFICATE OF WORD COUNT

The undersigned hereby certifies that the foregoing brief complies with Local Rule 7.3(d) in that it contains fewer than 6,250 words as reported by word processing software.

This the 24th day of October, 2024.

*/s/Patrick M. Kane*
Patrick M. Kane

## <u>CERTIFICATE OF SERVICE</u>

This will certify that Plaintiff is serving Plaintiff's Brief in Support of Motion for Preliminary Injunction upon Defendants contemporaneously with service of the Motion for Preliminary Injunction, Verified Complaint and Motion to Seal and Exhibit A to the Motion to Seal as follows:

> Lauren E. Kulp
> 37 Landover Circle
> Chapel Hill, NC  27516
>
> Tandem Legal Solutions LLC
> c/o Lauren E. Kulp, Registered Agent
> 1710 E. Franklin Street, #1175
> Chapel Hill, NC  27514

This the 24th day of October, 2024.

> *s/Patrick M. Kane*
> Patrick M. Kane

33